1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF KANSAS
2

3  IN RE:  HILL'S PET NUTRITION,        Docket No.
   INC.,                                19-md-2887-JAR-TJJ
4  Dog Food Products Liability
   Litigation.
5                                       Kansas City, Kansas
                                        Date:  07/29/2019
6  ........................

7             TRANSCRIPT OF INITIAL CONFERENCE

8                        BEFORE

9           THE HONORABLE JULIE A. ROBINSON
           UNITED STATES CHIEF DISTRICT JUDGE
10
             THE HONORABLE TERESA J. JAMES
11           UNITED STATES MAGISTRATE JUDGE

12
   For the Blaser Group Plaintiffs:
13

14  Scott A. Kamber                 Deborah Kravitz
    KamberLaw, LLC                  KamberLaw, LLP
15  201 Milwaukee Street            401 Center Street
    Suite 200                       Suite 111
16  Denver, CO 80206                Healdsburg, CA 95448

    Joseph N. Kravec, Jr.           Sarah S. Ruane
17  Wyatt Lison                     Wagstaff & Cartmell, LLP
    Feinstein, Doyle,               4740 Grand Avenue
18     Payne & Kravec, LLC          Suite 300
    429 Fourth Avenue               Kansas City, MO 64112
19  Suite 1300
    Pittsburgh, PA 15219            Lynn R. Johnson
20                                  Shamberg, Johnson
    Joseph I. Marchese               & Bergman
21  Bursor & Fisher, P.A.           2600 Grand Boulevard
    888 Seventh Avenue              Suite 550
22  New York, NY 10019              Kansas City, MO 64108

23  Lawrence C. Gates
    Gates, Shields, Ferguson,
24     Swall, Hammond, P.A.
    10990 Quivira Road
25  Suite 200
    Overland Park, KS 66210

```
 1  APPEARANCES:  (Continued)

 2  For the Schubert-Coykendall Group Plaintiffs:

 3  Robert C. Schubert            Robert W. Coykendall
    Schubert, Jonckheer           Morris, Laing, Evans,
 4     & Kolbe, LLP                  Brock & Kennedy, Chtd.
    Three Embarcadero Center      300 North Mead Street
 5  Suite 1650                    Suite 200
    San Francisco, CA 94111       Wichita, KS 67202

 6

 7  For the Hall Group Plaintiffs:

 8  Ashlea G. Schwarz             Rebecca A. Peterson
    Paul, LLP                     Lockridge, Grindal,
 9  601 Walnut Street               Nauen, P.L.L.P.
    Suite 300                     100 Washington Avenue South
10  Kansas City, MO 64106         Suite 2200
                                  Minneapolis, MN 55401
11  John A. Macoretta
    Spector, Roseman              Nyran Rose Rasche
12     & Kodroff, PC              Cafferty, Clobes,
    2001 Market Street              Meriwether &
13  Suite 3420                      Sprengel, LLP
    Philadelphia, PA 19103        150 S. Wacker Drive
14                                Suite 3000
    Ivy T. Ngo                    Chicago, IL 60606
15  Franklin D. Azar
       & Associates, PC
16  14426 East Evans Avenue       Kenneth A. Wexler
    Aurora, CO 80014              Wexler Wallace, LLP
17                                55 West Monroe Street
                                  Suite 3300
18                                Chicago, IL 60603

19  For the MRS Group Plaintiffs:

20  Rachel E. Schwartz            Gary E. Mason
    Stueve, Siegel, Hanson, LLP   Whitfield, Bryson
21  460 Nichols Road                & Mason, LLP
    Suite 200                     5101 Wisconsin Avenue NW
22  Kansas City, MO 64112         Suite 305
                                  Washington, DC 20016
23  Michael R. Reese
    Reese, LLP
24  100 West 93rd Street
    16th Floor
25  New York, NY 10025
```

```
 1   APPEARANCES: (Continued)

 2   For the MRS Plaintiffs:

 3   Melissa R. Emert              Rosemary M. Rivas
     Stull, Stull & Brody         Levi & Korsinsky, LLP
 4   6 East 45th Street           44 Montgomery Street
     Fifth Floor                  Suite 650
 5   New York, NY 10017           San Francisco, CA 94104

 6   Charles E. Schaffer          Jeffrey S. Goldenberg
     Levin, Sedran & Berman, LLP  Goldenberg Schneider, LPA
 7   510 Walnut Street            One West Fourth Street
     Suite 500                    18th Floor
 8   Philadelphia, PA 19106       Cincinnati, OH 45202

 9
     For the Defendant:
10
     Richard B. Goetz            Thomas P. Schult
11   O'Melveny & Myers, LLP      Jennifer B. Wieland
     400 South Hope Street       Berkowitz Oliver, LLP
12   18th Floor                  2600 Grand Boulevard
     Los Angeles, CA 90071       Suite 1200
13                               Kansas City, MO 64108

     Hannah Y. Chanoine
14   O'Melveny & Myers, LLP
     Times Square Tower
15   7 Times Square
     New York, NY 10036
16

17   Also Present:

18   Andy DeMarea                 Matthew D. Schultz
     Kenner, Nygaard, DeMarea,    Levin, Papantonio, Thomas,
19     Kendall, LLC                 Mitchell, Rafferty
     117 West 20th Street           & Proctor, PA
20   Kansas City, MO 64108        316 South Baylen Street
                                  Suite 600
21                                Pensacola, FL 32502

22

23

24

25
```

1              (9:04 a.m. proceedings commenced).

2         CHIEF JUDGE ROBINSON:  You can be seated.

3  Good morning.

4         All right.  We will start by calling this case.

5  It's MDL No. 2887.  *In re: Hill's Pet Nutrition, Inc.,*

6  *Dog Food Products Liability Litigation*.

7         And I understand that you all have checked in

8  with us this morning and indicated who's here, who

9  intends to speak on behalf of the various

10 self-identified groups of plaintiffs' counsel as well as

11 on behalf of defense, the defendants.

12        And we have a number of counsel on the phone

13 line, it's a non-speaking line, but we do want to

14 acknowledge that they are here and will be listening in

15 this morning as well.

16        So let's start by having appearances on behalf of

17 the parties.  And let's start with the defendant.

18        MR. GOETZ:  Good morning, Your Honor.

19 Richard Goetz of O'Melveny & Myers on behalf of the

20 defendants.  I have with me Hannah Chanoine, who's also

21 with O'Melveny, and Tom Schult and Jennifer Wieland, who

22 are from the Berkowitz Oliver firm.

23        CHIEF JUDGE ROBINSON:  All right.  Thank you.

24 And who will be speaking for defense counsel today?

25        MR. GOETZ:  I will, Your Honor.

1        CHIEF JUDGE ROBINSON:  Okay.  All right.  And

2   then on behalf of plaintiffs.  And you all have checked

3   in under various group names, so let's begin with the

4   Blaser Group.

5        MR. KAMBER:  Good morning, Your Honor.  My

6   name is Scott Kamber on behalf of the Blaser Group from

7   KamberLaw.  And I'm here with my partner Deborah Kravitz

8   from KamberLaw.

9        CHIEF JUDGE ROBINSON:  All right.  Thank you.

10  And you're going to be primarily speaking, Mr. Kamber?

11       MR. KAMBER:  I will, Your Honor.

12       CHIEF JUDGE ROBINSON:  Okay.

13       MR. KRAVEC:  Good morning, Your Honor.  My

14  name is Joe Kravec with Feinstein, Doyle, Payne &

15  Kravec.  I'm part of the Blaser Group.  I'm here also

16  with my partner Wyatt Lison, who is just observing

17  today.

18       CHIEF JUDGE ROBINSON:  Thank you.

19       MS. RUANE:  Good morning, Your Honor.  I'm

20  Sarah Ruane from Wagstaff & Cartmell, also a part of the

21  Blaser Group.

22       CHIEF JUDGE ROBINSON:  Thank you.

23       MR. MARCHESE:  Good morning, Your Honor.

24  Joseph Marchese of Bursor & Fisher for the Blaser Group.

25       MR. JOHNSON:  Good morning, Your Honor.  Lynn

1    Johnson of Shamberg, Johnson & Bergman on behalf of the

2    Plaintiff Blaser.

3            MR. GATES:  And Lawrence Gates on behalf of

4    Gates Shields on behalf of the plaintiffs also.

5            CHIEF JUDGE ROBINSON:  All right.  And then

6    the-- I'll just call it the Schubert Group.

7            MR. SCHUBERT:  Good morning, Your Honor.

8    Robert Schubert, Schubert, Jonckheer & Kolbe on behalf

9    of the Schubert-Coykendall Group.

10            MR. COYKENDALL:  Good morning, Your Honor.

11    Robert Coykendall from Morris, Laing on behalf of the

12    Schubert Group as well.

13            CHIEF JUDGE ROBINSON:  All right.  And my

14    understanding is both you, Mr. Schubert, and you, Mr.

15    Coykendall, are going to be primarily speaking on behalf

16    of your group this morning?

17            MR. COYKENDALL:  Correct, Your Honor.

18            CHIEF JUDGE ROBINSON:  Okay.  All right.  And

19    then the Hall-Schwegmann Group I'll call it.

20            MS. SCHWARZ:  Good morning, Your Honors.

21    Ashlea Schwarz from Paul, LLP.  And we went with the

22    Hall Group because we didn't want to put all of our

23    names in there and couldn't come up with a good team

24    name.  So everyone is just going to get to introduce

25    themselves.  And Rebecca Peterson will be speaking for

1  our group.

2              CHIEF JUDGE ROBINSON:  All right.  Thank you.

3              MS. PETERSON:  Good morning, Your Honors.

4  Rebecca Peterson on behalf of the Hall Group plaintiffs.

5              MR. MACORETTA:  Good morning, Your Honor.

6  John Macoretta from Spector Roseman & Kodroff on behalf

7  of the Hall Group plaintiffs.

8              MS. RASCHE:  Good morning, Your Honors.

9  Nyran Rose Rasche from Cafferty, Clobes, Meriwether &

10  Sprengel also with the Hall Group.

11              MS. NGO:  Good morning, Your Honor.  My name

12  is Ivy Ngo from Franklin D. Azar & Associates and I'm

13  also with the Hall Group.  Thank you.

14              MR. WEXLER:  Good morning, Your Honor.  Ken

15  Wexler from Wexler Wallace on behalf of the Hall Group.

16              CHIEF JUDGE ROBINSON:  All right.  Thank you.

17  And then I'll call this the-- I think you call this the

18  MRS Group.

19              MS. SCHWARTZ:  Good morning, Your Honors.

20  Rachel Schwartz from Stueve, Siegel, Hanson.

21              MR. MASON:  Good morning, Your Honors.  Gary

22  Mason; Whitfield, Bryson & Mason, LLP.

23              MR. REESE:  Good morning, Your Honor.

24  Michael Reese from Reese, LLP.

25              CHIEF JUDGE ROBINSON:  And my understanding

1   is you're going to be primarily speaking for the group.

2        MR. REESE:  Ms. Schwartz will be primarily

3   speaking for the group, Your Honor.

4        CHIEF JUDGE ROBINSON:  Okay.

5        MS. EMERT:  Good morning, Your Honors.

6   Melissa Emert from Stull, Stull & Brody.

7        MS. RIVAS:  Good morning, Your Honors.

8   Rosemary Rivas of Levi & Korsinsky.

9        MR. SCHAFFER:  Good morning, Your Honors.

10   Charles Schaffer from Levin, Sedran & Berman.

11        MR. GOLDENBERG:  Good morning.  Jeff

12   Goldenberg from Goldenberg Schneider in Cincinnati.

13        CHIEF JUDGE ROBINSON:  All right.  Thank you.

14   Thank you all.

15        Well, first of all, for most of you, welcome to

16   Kansas.  We're glad you found us.  We're glad that you

17   didn't go to the Wyandotte County Courthouse, which is a

18   few blocks from here.  That often seems to be where

19   people go.

20        We're glad you didn't go to the federal

21   courthouse in Kansas City, Missouri, which we can look

22   across the river and virtually-- almost see from here.

23   And sometimes that confuses people and they go there.

24   So we're glad you're here and in the right place this

25   morning.

1          My name is Julie Robinson.  As you know, I'm the

2   Chief Judge for the District of Kansas.  And Judge

3   Teresa James.  The two of us are your team working on

4   this case together.

5          I'll introduce you to some of our staff whom you

6   have already had some interaction with I'm sure.  This

7   is Bonnie Wiest, who is my courtroom deputy.  Kelli

8   Stewart, who is my CSR, certified shorthand reporter,

9   court reporter.

10         And then over in the jury box on the far right

11   side is Carol Kuhl, who is the courtroom deputy for

12   Judge James.  And there are-- we each have law clerks

13   that are our primary law clerks on this case.  So in the

14   first row on the right is Michele Nelson, who is Judge

15   James' MDL law clerk we'll call her.  And Rachel Simek

16   seated next to her is my MDL law clerk.

17         And I have two other term law clerks in the back

18   row there, Meghan Harper and Lauren Stanley.  And then

19   Connor DeWitt, who is an intern from KU this school

20   year-- or this summer rather.

21         So let me just say at the outset, let me say that

22   we are very appreciative of the submissions that you

23   have given us.  As you know, you know far more about

24   this case than Judge James and I know, although

25   hopefully we'll be quick studies and soon be brought up

 1   to speed with your tremendous help and educational

 2   process.

 3           And along those lines, your prehearing

 4   submissions have been very helpful:  Your statements of

 5   the case, your proposed agendas, your applications and

 6   all of the accompanying materials.  We have reviewed

 7   those thoroughly and feel like we're well on our way to

 8   learning what we need to know about this case and the

 9   circumstances underlying this case as well as well on

10   our way to knowing each of you.  And we do thank you for

11   all of the submissions, they've been very thorough and

12   they've been very thoughtful and obviously the product

13   of a lot of work.

14           I've been a district judge for 18 years now and I

15   think there a number of things I love about what I do:

16   Always challenging, always being exposed to new types of

17   cases and new facts as well as new law or law that I've

18   never been exposed to before, and also being exposed and

19   meeting new lawyers and, in particular, highly-talented,

20   highly-skilled lawyers like those of you that are here

21   in the courtroom today.

22           And this case at least presents for me the

23   opportunity to have all of the above, and I think that's

24   why I'm so much looking forward to working with all of

25   you and working on this case.

1       I've never handled an MDL case in 18 years, and I

2  just want to give you some assurance at the outset that

3  I'm surrounded in this courthouse by other judges who

4  have, people that are very experienced in MDL work.  And

5  Judge James is one of those.  She's actually currently

6  working on an MDL case with Judge Crabtree, the *EpiPen*

7  MDL.  So I'm very fortunate to have her as my team on

8  this case, you're very fortunate to have her as well.

9  But I think I speak for her and for me for sure that

10  we're very excited to be handling this case and very

11  excited to be working with such a fine group of

12  accomplished and experienced lawyers.

13       So what I would like to do today-- we've issued a

14  notice of proposed agenda.  And, of course, the primary

15  focus of today's hearing is to take up the applications

16  for leadership roles.

17       There were other things on the agenda as well, at

18  least some preliminary discussions about scheduling.

19  And I have to say that I am heartened by so many of you

20  talking about the prospect of early mediation in this

21  case, so I'd like to talk to you a little bit about that

22  a little later this morning.

23       I think I can glean from your many submissions

24  that we are all on the same page in terms of

25  understanding that this case will be governed by Rule 1.

1    This is not going to be an MDL case that gets lost and

2    gets into a black hole and-- I mean, I can tell you that

3    I'm now a transferor judge about to get a remand of an

4    MDL that's been pending since 2005.

5          This is not going to be that kind of case, I will

6    assure you.  I'm not going to be-- although I may

7    ultimately be remanding this case back, it won't be 15

8    years from now.  It will be a lot sooner than that.

9          In fact, my view is it's just as important in

10   these types of cases from what I've seen from afar to

11   have a firm remand timeline.  It's just as important to

12   do that as to have a firm trial timeline for those cases

13   that will be tried.

14         So I want to just provide-- to tell you at the

15   outset that we're going to be doing everything we can to

16   make this an expeditious and a fair and a just process

17   for the many litigants who are involved in this case.

18         So Judge James is a discovery expert.  I am not.

19   The way we operate in the District of Kansas, the

20   magistrate judges are the discovery and scheduling and

21   case management experts.  And that is the way we operate

22   in terms of how we handle MDL cases as well.

23         And so she is going to be very involved in all

24   things having to do with the discovery and movement and

25   management of this case.  As am I.  But she's going to

1   take the lead on the discovery piece of it and be

2   involved at least on what I would call the nitty-gritty

3   of the discovery schedule and related issues.

4        So I know that she has some thoughts about that

5   and she's going to be sharing some of her thoughts with

6   you this morning.  As am I.

7        And so, of course, again, the focus of today's

8   hearing is going to be on the applications for

9   leadership roles in this litigation, but I don't want to

10   leave here today without at least having a roadmap and

11   being able to impart to you what we want to do next.

12        And our next hearing will be on August 19th here

13   in this courthouse.  9:00.  And the notice of that

14   hearing sets August 12 as the deadline for you all to

15   present to us-- to file a joint status report ahead of

16   that hearing.

17        So I don't want to leave here today without at

18   least having some discussion about what we anticipate we

19   will take up on August 19th and what we'll be wanting

20   you to be talking about in your joint status report as

21   well.

22        So what I'd like to do is start with that and

23   give each of the four groups who have self-identified in

24   terms of applications for leadership 15 minutes to tell

25   us what you will about the list of items in the agenda,

 1   much of which came from your proposals for agenda items

 2   today.

 3        Tell us what you will about scheduling, about

 4   discovery, about early mediation, about timing on filing

 5   of consolidated complaint and motions to dismiss,

 6   motions for class certification, about filing-- timing

 7   about filing proposed protective orders, ESI protocols

 8   and related early orders in the discovery process, your

 9   thoughts on common benefit orders.  And to the extent -

10   and I know that you all have been meeting and conferring

11   already - to the extent you can share with me that, you

12   know, where you think you're at in terms of these issues

13   and are there areas of agreement or not or areas that

14   need more meet and confer ahead of the August 19

15   hearing.

16        So you don't have to use the whole 15 minutes,

17   but I'll give you 15 minutes just to sort of cover all

18   of those agenda items at the outset.  Maybe we can get

19   all of that taken care of within the next hour and then

20   we can have the balance of the day for the important

21   process of discussing who should have leadership roles

22   in this litigation.

23        So let me start-- actually I'll start with the

24   defendant on these items.  Mr. Goetz.

25             MR. GOETZ:  Thank you, Your Honor.  I was

1    told to put this in front of me, so I will do that.

2                CHIEF JUDGE ROBINSON:  I'm sorry?

3                MR. GOETZ:  I was told to put this in front

4    of me.

5                CHIEF JUDGE ROBINSON:  That helps.

6                MR. GOETZ:  We have had discussions with the

7    various plaintiffs' groups on a schedule.  It will be

8    easier to have those discussions when we know who is in

9    the leadership role.

10           One common theme we've had is that we have all

11   agreed that it makes sense to try to have an early

12   mediation in this case and to move as aggressively as we

13   can to accomplish that.

14           And the defendant's position is we're already

15   refunding people's money they've spent on our product

16   and the money they've spent with veterinarians to have

17   their dogs tested, and we're refunding money directly to

18   the veterinarians and to our consumers.

19           We would continue to do that and we would invite

20   a discussion with a leadership group amongst the

21   plaintiffs to talk about how we can wrap this case into

22   that process and come up with a settlement hopefully,

23   that we can come back to this court on a class-wide

24   basis.

25           We think that should take the priority and would

 1    recommend that we have a schedule that the court sets to

 2    accomplish that and that we report back to the court

 3    quickly and regularly.  And if it doesn't accomplish a

 4    settlement, that we then set the deadlines for the next

 5    steps.

 6         Part of what we want to accomplish in the

 7    mediation is to save the money of litigating through

 8    extensive discovery and all the other processes that

 9    would normally happen as we kick off an MDL.

10         Obviously we would produce materials to the

11    plaintiffs that they feel they need that we can agree on

12    in order to come to a mediation.  And in writing we've

13    already offered to produce categories of information so

14    that they can assess the facts and come to a mediation

15    well-prepared.  And we would move quickly on that.  And

16    I'm sure once a leadership group is proposed that we'll

17    have a discussion with that group on whether they're

18    satisfied with our proposal or that they wish to have

19    more.

20         So we would like to be able to complete the

21    mediation by the end of October.  That may be

22    aggressive.  We've talked with some of the plaintiffs'

23    groups that that may be aggressive and I understand that

24    may be aggressive.  But I think once we have a

25    leadership group proposed, that we can agree upon a

1   mediator, a process, a location, and move forward.  And

2   if we can't meet that goal, then we'd come back to the

3   court and explain it.  And I would propose that we have

4   regular check-ins with the court on what the process is

5   in the interim.

6        We have proposed to the plaintiffs that we agree

7   on a mediator by August 30, and that the court in its

8   discretion may ask that the mediator and settlement

9   counsel have status conferences before you to discuss

10  our progress.  I'm happy to go over what we've proposed

11  in terms of disclosure, but maybe that could wait until

12  later in the day.

13       In terms of the agenda items that you put forth

14  for us to discuss today, I think that covers No. (1).

15  I'm happy to go into more detail on what we would

16  propose for a natural mediation process, but I would

17  suggest that it makes sense for us to actually have that

18  discussion with the leadership group before we report to

19  Your Honor.  And I hope we could easily come up with

20  agreement on the process.

21       You asked about the status of discovery already

22  served in these cases.  There has been very little.  We

23  have outlined it in our written submission and I'm happy

24  to summarize those here, but there really has been very

25  little in the way of actual discovery.

1          The plaintiffs themselves have done some Freedom

2    of Information Act request to the FDA and they've cited

3    those materials in their submissions.  But beyond that,

4    there really hasn't been much.

5          As far as a consolidated complaint, that's really

6    a plaintiffs' issue.  We would propose 30 days from the

7    August 19th status conference, maybe longer if the

8    plaintiffs' leadership feels that they need that, but I

9    would hope within 60 days that we would have the

10   consolidated complaint.

11         I'll skip (4) since that's your preference on how

12   to handle discovery disputes, and we look forward to

13   hearing from the court.

14         Timing for submission of a proposed protective

15   order, proposed ESI protocol and document preservation

16   order.  We're working on these now.  We have our own

17   proposals on each of these.  This also depends upon the

18   selection of the plaintiffs' leadership.  We probably

19   will need 30 days once we have a leadership in place to

20   come to agreement, perhaps longer, but certainly no less

21   than 30 days to have that back-and-forth.  I don't think

22   it will be terribly controversial, we've all done this

23   before, it's just a matter of picking which one.

24         The need for and timing of protocols on fees,

25   expenses, billing, and reimbursement.  That's also a

1   plaintiffs' issue, but the devil is kind of in the

2   details on that.  One of the things we want to make sure

3   we avoid is having protocols that are to govern the MDL

4   that would interfere with the claims process.  People

5   who put in claims with Hill's and wish a refund, we

6   don't want to have anything in this court slow that

7   down.  Happy to have the plaintiffs alerted to what

8   we're doing.  We have already told them what we're

9   doing.  We have shared what correspondence is going to

10   the plaintiffs, what we're asking for from-- customers I

11   mean, who are seeking refunds.

12       I do note that there's-- for example, in the

13   Lockridge proposal, this is Exhibit M to their proposal,

14   and it's a draft order establishing protocols for common

15   benefit work.  And there's a statement on Page 21 there

16   that the defendants and their counsel shall not

17   distribute any proceeds, whether by settlement or in

18   satisfaction of judgment to any plaintiffs' counsel or

19   directly to a plaintiff in cases covered by this order

20   until certain procedures are followed.

21       This is the kind of thing that we would-- and, of

22   course, I'm not calling out Lockridge, it's just one I

23   picked.  We would want to talk with them.  We would want

24   to avoid having that kind of language stop dead in its

25   tracks a claims process that has worked for many

1    customers of Hill's already.

2         Beyond that, I think we just need to see what

3    does the leadership proposal recommend.  We will have

4    positions on a few things like that.  We may have

5    positions on the fee structure when plaintiffs seek an

6    award of fees of a lodestar or a percentage, I'm sure

7    we'll have views on that to the extent it's put in a

8    court order now as opposed to looked at at the end of

9    the day, but I think we'll probably come to agreement

10   quickly on these things.

11        And there's a lot of proposals that these groups

12   have put forth that have very good proposals in them.

13   And I think at this point the only thing I would comment

14   is that there's a few things in those proposals that we

15   probably should focus on now, such as one of the

16   proposals was to bill in tenths of an hour for

17   calculating the lodestar.  I think that makes sense.  It

18   makes sense to start that now.  Most of the rest of the

19   things we can look at at a later time once we have a

20   proposal.

21        So long as the plaintiffs' counsel keep detailed

22   records that aren't vague, that explain what they've

23   done, and that do so in that tenth-of-an-hour increment,

24   when we come to an agreement later, we can look back at

25   bills and have the information we would need to decide

1   whether it's recoverable.

2        So, for example, at least one of the plaintiffs

3   has suggested that when everyone in this courtroom are

4   on the phone, listens in on a conference call, they're

5   not necessarily going to get paid for that unless it's

6   something that's directed by lead counsel.  I think that

7   makes sense.  But again, it's something we would discuss

8   with the leadership.  And as long as everyone on the

9   phone and in this courtroom has kept clear records, we

10  would be able to address that once we have that protocol

11  in place.

12       You also asked, Your Honor, about the breadth of

13  state laws implicated by the plaintiffs' claims.  I'm

14  happy to address that.  It's not something you flagged

15  this morning, but it is-- as we put in our submission,

16  it's quite an issue.  It's, we believe, a significant

17  issue in a class action.  And these are a pool of class

18  actions; some of them nationwide, some more focused.

19       And let's say it's a nationwide class action,

20  which is probably where we'll end up in a master

21  complaint, you have to look at the great variations in

22  law of the states.

23       So, for example, as we have pointed out, very few

24  states allow any emotional distress claims for mere

25  negligence.  Wyoming may, Montana may.  It's unclear

1   whether Arkansas does.  Most states don't.  There's some

2   provisions in some states' laws, such as New York's

3   laws, that might allow some emotional distress in some

4   circumstances, I'm not sure, I haven't read all of that

5   yet.

6        Most states say you can't get it for a pet.  And

7   emotional distress claims in general in most states you

8   can't get it unless you have medical records that are

9   more than just:  I'm sad because of the harm my dog

10  suffered or my spouse suffered in a personal injury

11  action.  You have to have something more than that to

12  recover emotional distress.

13       So just focusing on that one law, that one issue

14  and how it cuts across all the 50 states that are going

15  to be involved in this case, you can see it's a very

16  complicated question.

17       I think that's typically why it is very hard to

18  get a nationwide class action certified in a case like

19  this that involves essentially personal injury claims,

20  injury claims to a pet here that they're crafting on

21  some personal injury aspects to it in some of the

22  complaints.

23       It also presents challenges to how do you try the

24  case.  I know some of the submissions have suggested a

25  bellwether approach, and that's tough to do in a case

1   that involves the laws of many different states.  You in

2   a class action would typically have to have a

3   representative who represents the laws of the states

4   that's implicated.  You can't just pick a bellwether

5   from Kansas and have that person represent all of the 50

6   states.

7          And so I would suggest that a suggestion of a

8   bellwether process that we've seen in some of the

9   submissions will be difficult here.  And it's partly

10  because of that choice of law issue that you've

11  highlighted in Item 7.

12         The good news is I think the remand timeline Your

13  Honor mentioned at the beginning is a little different

14  here.  We're talking about class actions.  And so you

15  can try-- if you certify a class action for settlement,

16  you can-- and that's hopefully where we end up, you

17  wouldn't have to remand anything.  Those settlement--

18  that would be a nationwide class settlement and that

19  would be the resolution of the matter.

20         But if you have multiple nationwide class actions

21  and then you remand some of them, I think you're going

22  to be in a confusing situation where you're remanding to

23  a state in another-- to a court in another state the

24  exact issue that the remaining cases here in Kansas are

25  asking you to try, which is a nationwide class involving

1    the same claims.

2         That's down the road but I just wanted to put a

3    pin in that remand issue because this is a little

4    different.  It's a MDL of class actions than an MDL of

5    individual personal injury cases where remand, of

6    course, is an important part of the process.

7         I'll stop there, Your Honor.  I think I've

8    attempted to answer your questions.  I'm sure I'll have

9    other thoughts in response to the plaintiffs' comments

10   and I'm happy to address anything else you wish.

11        CHIEF JUDGE ROBINSON:  All right.  Thank you.

12   I appreciate it.

13        MR. GOETZ:  Thank you.

14        CHIEF JUDGE ROBINSON:  All right.  Let's next

15   hear from the Blaser Group.

16        MR. KAMBER:  And, Your Honor, am I correct

17   in-- the court would like us to address the agenda items

18   this time and not discuss the specifics of our

19   leadership application.  Correct?

20        CHIEF JUDGE ROBINSON:  Correct.  At this

21   time.  Correct.

22        MR. KAMBER:  Okay.  Let me start out by just

23   assessing generally pet food litigation and the

24   perspective on pet food litigation, because I think that

25   informs each of the points of the agenda and my

1    responses to the court and the groups' responses to the

2    court on that.

3         Pet food cases are particularly unique where they

4    appear on the surface to be a consumer case, like many

5    other consumer cases.  Pet food cases are unique, and I

6    think this should inform the court's perspective on each

7    of these agenda items, because pet owners are

8    particularly loyal.  Pet owners are concerned about

9    their pets.  It's not like a consumer case where for

10   human consumption the human can tell you if something

11   doesn't taste good.  A human can tell you things about

12   their food in a way that a pet cannot.

13        Pet owners oftentimes look at things and feel a

14   real responsibility for their pets in a way that's

15   different than the way humans perceive the way they may

16   feed their family or the way they may feed themselves.

17   And this comes from our perspective.  My firm has been

18   involved in the two largest pet food MDLs, at least the

19   two largest that we know of, and I've personally spoken

20   to thousands of pet owners over the years in dealing

21   with their claim.  In one case involving consumer, one

22   case involving the claims process.

23        So in this case I think it's important to realize

24   that it involves recalled dog food.  Okay?  This time we

25   have a particular list of products that are involved, a

1   particular number of cans involved, particular foods

2   involved.  I think that is important when one looks at

3   the discovery and how the-- what discovery is necessary

4   before early resolution or discussions regarding early

5   resolution and how one approaches the case.

6          Because simply put, Your Honor, if in some of

7   the-- not all the plaintiff groups have the same

8   perspective on this I think, which is clear from the

9   papers and also several of the complaints.  But it was

10  clear in the agenda put forward in the preliminary-- in

11  the statement put forward by plaintiffs to the court;

12  and that is, to our group what is in the interest of the

13  class is to focus on the recalled dog food, okay, which

14  is all wet dog food.  Okay?

15         There's been some discussions that there should

16  be-- that some dog food may not have had sufficient

17  amounts of Vitamin D, some unrecalled dog food may have

18  caused some harm.  To us, that doesn't belong in this

19  case.  It will make early resolution more difficult, it

20  will make case management more difficult.

21         It is not the-- although our group wants to work

22  with everyone else, and we'll talk about that more when

23  we discuss our group, we think it's important that a

24  decision be made early on that, like the name of this

25  MDL regarding dog food, that this is a fairly narrowly

1    tailored MDL, narrowly tailored to most of the

2    complaints here, which is recalled dog food.

3         So with that in mind, Your Honor, establishing a

4    process for early class-wide mediation or resolution we

5    believe, like defendants, that that should be a

6    mediation process.  The timing set forth by defendants

7    is consistent with the timing of the Blaser Group.  I

8    think it is possible to do that by the end of October.

9         The *Blue Buffalo* case which mediated-- that

10   mediated prior to class certification.  Not inconsistent

11   with an early resolution, just depends how early.  The

12   *Menu Foods* case, similarly another pet food case that

13   had early resolution prior to many of the events that

14   would normally be expected.

15        Where we have a bit of a distinction I think from

16   the Blaser Group and that of the defendants is we don't

17   believe that everything should be put on hold until

18   October.  We don't think that will ultimately lead to

19   any particular benefit that the case should somehow be

20   stayed.  And we know that's frowned upon generally in

21   this district.  We believe it is realistic to put

22   forward an amended consolidated complaint within 30 days

23   of the appointment of lead counsel.

24        Similarly, Your Honor, we believe a mediator can

25   be selected by the end of August.  In fact, based on the

1   discussions and the familiarity that we have with

2   defense counsel and members of our group have with

3   defense counsel, we would be optimistic that a mediator

4   can be selected even faster than that.  But certainly if

5   a mediator is selected by the end of August, a date of

6   mediation would be able to be obtained before the end of

7   October.

8          We think that the status of the discovery already

9   served that's in Agenda Point (2) prior to the

10  consolidation, the informal discovery, there has been

11  FOIA requests out there.  There has been an awful lot of

12  information from government filings.  One can see from

13  some of the complaints, including the Blaser complaints,

14  that there are details regarding the involvement of DSM

15  put forth in the complaint itself.

16         There have been disclosures made in a number of

17  litigations by defendants.  Also there have been

18  disclosures shared with defendants in the cases that did

19  not have formal disclosures made.  So there was an

20  abundance of information available.  Maybe not quite

21  enough to conduct a mediation tomorrow but certainly

22  well on the way to be able to get necessary information

23  in order to have an initial mediation before the end of

24  October.

25         Regarding the motion to dismiss, motion for class

1    certification regarding Agenda Point (3).  Again, after

2    a consolidated complaint is filed, we do not believe

3    that the scheduling of the mediation should determine

4    whether or not a motion to dismiss should be filed

5    within the guidelines and guidance of the Federal Rules.

6    We believe the motion to dismiss, if there is one,

7    should be filed.  If it's before the mediation, that

8    would inform the-- that may inform the mediation and

9    inform defendant's perspective.

10         Having resolved many, many cases on an early

11    basis, one of the key factors of resolving a case early

12    is not to concede that the case is necessarily going to

13    settle early.  The case needs to move forward

14    expeditiously on a non-settlement path while at the same

15    time extending an olive branch and seeking to have the

16    case resolved early.

17         In a pet food case-- again, going back to my

18    first point that pet food cases are unique.  In this

19    situation, the plaintiff group is really divided--

20    there's only really-- only one distinction between

21    different plaintiffs.  There are plaintiffs who

22    purchased the dog food who were not harmed, who consumed

23    and were not harmed, and there were the plaintiffs that

24    were harmed.  Some may be a refund, some may not.  But

25    the plaintiffs are out money, real money in vet bills,

1    et cetera.

2         And it is important, I believe, that that be

3    considered by whoever is in a leadership group, the

4    value that's put on pet owners of being compensated and

5    reimbursed for their monies.  And I believe that as

6    there's been some disputes in this case that have been

7    litigated in court, and you hear from defendants as they

8    spoke today, Defendant Hill's has voiced an interest in

9    maintaining its customer base, not alienating its

10   customers.  And it has associated that action with

11   making sure that they are giving some compensation to

12   people who are members of the class.

13        Certainly whoever is class counsel needs to

14   safeguard that process and make sure that the class

15   isn't either limited or extinguished or that people are

16   not taken advantage of in that process.  But the Blaser

17   Group does agree with defendants in that there should

18   not be a process that stops the disbursement of funds to

19   plaintiffs who are in need of those funds.  There are

20   many people who had thousands of dollars in veterinary

21   bills who didn't anticipate that cost, who it is

22   meaningful to their lives they get that money back as

23   soon as possible.

24        Our preferred method for resolving discovery

25   disputes certainly would be consistent with this

1    district's practice, and that is informal processes,

2    working with the magistrate and working with defendants

3    to resolve things informally, or by letter whenever

4    possible, is certainly preferred.  There's just no

5    reason to get involved in motion practice where things

6    may be able to be informed-- or resolved informally.

7    And I think that goes to the point that just because

8    defendants and plaintiffs can't come to an agreement

9    doesn't mean it needs to be protracted.

10         And the timing for protective order and ESI

11   protocols, we have a draft of the ESI protocols, our

12   group does.  We want to take some additional time.  We

13   were able to reach agreement fairly quickly in the *Blue*

14   *Buffalo* case before Judge Sippel in the Eastern District

15   of Missouri.  The Eastern District's guidelines for the

16   ESI protocol are somewhat different but not

17   substantially different from the District of Kansas'

18   specific and helpful guidance to the parties regarding

19   ESI protocols.

20         We believe that that process can be done

21   relatively quickly.  We would be in a position to

22   exchange drafts of ESI protocols within a week of the

23   appointment of lead, and we believe there would be no

24   reason that agreement to the ESI protocols cannot be

25   reached within 30 days.

1           The need for any timing regarding other protocols

2      or orders relating to fees, expenses, billing or

3      reimbursement.  This is not the *Syngenta* case, Your

4      Honor.  This is not a multi-billion dollar case

5      involving as wide-flung issues as one would see in, for

6      instance, *Syngenta* that required multi-layered

7      protections, et cetera, regarding submissions and

8      reports.  Sometimes that type of activity could be more

9      than is necessary and will, in fact, burden the process.

10          It's been our experience that in consumer

11     litigations relative to this case's size that one need--

12     not need to get too complicated with respect to such

13     protocols.  We do think there's one thing in particular

14     that is important for guidance on this, and that is:

15     The Blaser's Group perspective is that any work done

16     prior to the appointment of lead should have a strict

17     scrutiny standard applied to it about whether it truly

18     benefited the class.

19          While things may be very clear, like the

20     assignment of the court to plaintiffs' counsel to work

21     together for an agenda or to work together for a

22     statement on behalf of all plaintiffs, there are other

23     things in motion practice that many times can be maybe

24     best viewed as posturing for lead counsel rather than

25     activities that necessarily benefit the class.

1          And we do think that guidance-- that whoever is

2     appointed class counsel should be very careful about the

3     submission ultimately for reimbursement of any time and

4     expense that takes place before the MDL and certainly

5     before the appointment of leadership.

6          Finally, Your Honor, the breadth of state laws

7     implicated by plaintiffs' claims in the MDL.  It is not

8     shocking that defendants would take the perspective that

9     this is difficult to certify, that there are many

10    complications and differences in state law.  And

11    certainly to some extent there are.  One thing is some

12    of the uncertainty that surrounds that, surrounds the

13    juris prudence of that in the Tenth Circuit and many of

14    the other circuits, is something that tends to drive

15    early resolution.

16         I don't think this court need wade into this

17    until the point of class certification.  I think

18    otherwise sometimes it has an unhelpful impact on the

19    mediation process.  One could imagine that if there was

20    a difference in perspectives at the mediation that kept

21    the parties from having a resolution, that there may be

22    some interest or some value in the court weighing in on

23    some of these issues.

24         But generally, it is our perspective that at the

25    time of class certification, that is after discovery has

1  been substantially completed on many of the issues, that

2  that is a particularly good time to look at any

3  differences in state law, et cetera.  And one approaches

4  that differently when one is making a motion for class

5  certification as opposed to how one is looking at this

6  before they're going to a mediation, which certainly if

7  there is an early resolution, I've never met a defendant

8  who doesn't want something that is nationwide and not

9  broken up by state.  And I think that is also evident by

10 their claims practice here.

11      That is the Blaser Group's response to your

12 agenda points, Your Honor.  If you have any further

13 questions, I can answer them at this time.

14          CHIEF JUDGE ROBINSON:  All right.  Thank you

15 much.

16          MR. KAMBER:  Thank you.

17          CHIEF JUDGE ROBINSON:  All right.  Let's now

18 turn to-- I forget the order in which I called you all.

19 I believe it was the Hall Group next.

20          MS. PETERSON:  Good morning, Your Honors.

21 Rebecca Peterson on behalf of the Hall Group.  And I

22 will keep this brief because I believe most of the

23 topics have been covered by the counsel before me.

24      I do want to touch on, though, what the Blaser

25 Group just spoke on about the scope of this case and

1    that it should only be the recalled products, because it

2    is the Hall Group's complaints that include allegations

3    for deficient Vitamin D based on independent testing.

4    And this is obviously something that can be discussed in

5    detail with whoever gets appointed lead, but it is our

6    belief that that should not be automatically dropped at

7    this time.

8         The issue here is that it is alleged that

9    defendant sold dog food that was adulterated based on

10   the level of Vitamin D.  The recall is specifically

11   related to toxic levels being higher than what's

12   allowed.  Our testing at the time, as alleged, is what

13   was deficient.  So it was too low.

14        And so if there is early mediation, which

15   everyone agrees to and the Hall Group also does, you

16   know, obviously informed mediation, and there would be

17   confirmatory discovery as defense counsel spoke about,

18   that if we're at the table talking about products made

19   by Hill's that had issues with Vitamin D, deficient

20   levels of Vitamin D should be there because likely the

21   release of any claims would cover those products if it's

22   related to Vitamin D.

23        Of course, I don't have a crystal ball so I can't

24   tell you for sure that the release would be that broad,

25   but I would assume that especially defendants, if they

1    wanted to resolve this issue, they would want to resolve

2    the issue as to all products and Vitamin D.

3         I also want to make clear that I'm not saying

4    that defendants have agreed that our testing is a valid

5    basis to say that there is deficient Vitamin D, but

6    that's what's alleged in the Hall complaints.

7         But let's go back to the agenda items.  The Hall

8    Group does agree that early mediation seems like a good

9    idea at this time and as long as it's informed.  If it's

10   by the end of October, that kind of feeds into I believe

11   some of your agenda items below, especially an ESI order

12   and a protective order, because there would have to be

13   an exchange of confirmatory discovery before any

14   mediation.  So I would assume that that would have to be

15   done right at the same time as this discovery is being

16   produced.

17        So if they want mediation by the end of October,

18   I would say that the ESI order and the PO has to be in

19   place by the end of August and discovery has to come

20   within that first week of October so all the parties

21   have enough time to adequately review the discovery so

22   when they're in that mediation room everyone is on a

23   equal playing field and it's informed.

24        In our papers we said that 30 days after the

25   filing of the lead motion is when we think a

1    consolidated complaint could be on file.  And I think

2    that's important, especially now with the fast track to

3    mediation, I feel the consolidated complaint should be

4    on file and before the parties when they're sitting down

5    at that early mediation session.

6         The other issue as to the motion to dismiss and

7    class certification, if we are doing mediation by

8    October 30th, I think that at that point then you could

9    set a motion to dismiss 45 days after the leadership

10   order because that would fall right around the time of

11   mediation or right after it.  But the Hall Group would

12   be willing to speak to defense counsel more or a lead

13   group as to whether or not they want to stay that until

14   after mediation.

15        Motion for class certification.  Generally the

16   Hall Group's position is that should be scheduled after

17   an order on a motion to dismiss just because you know

18   exactly the claims going forward and what's surviving,

19   and it makes it a much narrower and more focused brief

20   for the court and the parties if we actually know what

21   stands, continues on in the case.

22        The last point about the breadth of state laws

23   implicated.  The Hall Group agrees that that's a hard

24   issue right now, but it is going to be a nationwide

25   class, will be alleged in the consolidated complaint I

1    would assume, as defense counsel said.  And it would

2    be-- if you look at the definition, it would be

3    consumers who purchased the Hill's products, whether the

4    recalled ones or ones with the Vitamin D product.

5         Defense counsel focused a lot on pointing out the

6    issue with the emotional distress claims and how that

7    might kill class certification because of what laws

8    allow it, what laws don't.  This is really a liability

9    class issue.  So even if at the end of the day the

10   emotional distress claim is something that is too

11   individualized, there is always going to be able to be a

12   liability class here.  And that liability class would be

13   based on the defendant's negligently, intentionally sale

14   of dog food that had deficient or toxic levels of

15   Vitamin D.

16        But that's something that would obviously get

17   briefed in more detail at class certification, but I

18   would like to point out that that emotional distress

19   allegation that are in certain complaints - the Hall

20   Group do not have emotional distress - is something that

21   doesn't foreclose class certification anyways because

22   there could be just a liability class that's determined

23   by this court.  And every-- the liability class would be

24   based on the exact same evidence, because it's evidence

25   coming from defendant's actions, whereas the emotional

1   distress might involve more individual plaintiff's

2   discovery.

3       And with that, I don't have anything else unless

4   the court has any questions.

5       JUDGE JAMES:  Did you want to address the

6   fees issues?

7       MS. PETERSON:  Oh, I apologize.  So we

8   submitted Exhibit M and so we believe that answers the

9   question.  As to-- defense counsel I know did raise an

10   issue with one of our statements in Exhibit M, and we'd

11   be happy to meet and confer with them and make sure that

12   they're comfortable with it if at that point it's

13   actually being considered in this litigation.

14       But I would say that our intent was not what was

15   presented or how they reviewed it, because it's limited

16   to plaintiffs in this case.  And so they really

17   shouldn't be involved in the claims process because they

18   should be obviously working directly with us.  So if--

19   defense should only be speaking to us if it is our

20   plaintiffs in this case.

21       So that was not our intent, but we'd be more than

22   willing to make sure that that's amended or edited to

23   address their concerns.  Thank you.

24       CHIEF JUDGE ROBINSON:  Thank you.  Mr.

25   Schubert.

1          MR. SCHUBERT:  Thank you, Your Honor.  Put my

2    tag out.

3          Your Honor, our group represents 30 dog owners--

4    actually 61 dog owners representing 33 states.  It

5    results from approximately 300 contacts from affected

6    dog owners and virtually every one of them we've spoken

7    with by an attorney or a paralegal from our office.  And

8    that's let us learn quite a bit about how this problem

9    from Hill's has affected dog owners.

10         I have to say on a personal note, a lot of these

11   interviews are heart-wrenching and involves dog owners

12   taking a half hour or more just explaining how this has

13   affected them and affected their lives.

14         We agree strongly there should be an early

15   mediation of the case and that one of the

16   nationwide-known first-class mediators be selected.

17         But we think it's important to have very thorough

18   discovery prior to the mediation, and it might be wise

19   to move the mediation from an October date even to a

20   November date.  And we say this partially educated by

21   the contacts we've had with class members.  With all the

22   members we've talked to, despite three recalls of Hill's

23   dog food products, we've talked to dog owners whose pets

24   have suffered injuries that appear related to the

25   poisoned dog food and some even that have had positive

 1    Vitamin D testing from a lab whose food was not
 2    recalled.
 3         So we think it's very important to determine if
 4    the recalls were sufficient.  There were three of them.
 5    The most recent was one additional product.  We want to
 6    be sure that all-- that this case involves all the right
 7    dog food.
 8         In that regard, our case was filed in San
 9    Francisco.  And although Hill's moved to stay the case,
10    we tried very hard to get information on dog food that
11    may not have been recalled.  We agreed with Hill's on a
12    testing procedure for food that was not recalled.  We
13    had a testing protocol.  Food was sent out to labs
14    agreed to by our case and Hill's.  We're continuing that
15    process because some of the tests have anomalies in
16    them.  So we think that's extremely important to get to
17    the bottom of what this case is about, in other words,
18    which are the dog food cans that are really involved and
19    is it more than what Hill's has indicated in recall.
20         We also think it's terribly important to get
21    discovery on Hill's internal procedures.  We've done
22    FOIA requests and those requests have indicated
23    inadequacies in the testing procedures and
24    contradictions between what was represented by Hill's
25    and what was actually done, because we think that any

1   resolution of the case should not be just for

2   compensation to the affected people whose dogs got sick

3   and who bought food where the dogs didn't get sick.  It

4   also should involve injunctive or contractual relief

5   which will change the procedures that led to these

6   terrible problems.

7         Let me address the specific items since the court

8   has requested.  And discovery, we've talked a little bit

9   about that.  And I think that initial discovery should

10  be extensive.  And one open question is whether or not

11  we need either depositions or at least interviews with

12  key people at Hill's to get to the bottom, particularly

13  of the testing procedures.  We think that a consolidated

14  complaint should be filed within 30 days of the

15  scheduled hearing, which I believe is August 19th.

16        I think-- and in terms of motions to dismiss, I

17  think those can wait the results of a mediation.  And I

18  know the defense counsel indicated problems with

19  bellwether trials, but I think he may have misunderstood

20  what we were proposing, which is there will be 30 or 40

21  or 45 states involved in this litigation.  There are

22  differences in state laws in terms of what they'll

23  compensate, what needs to be proven.

24        We suggested bellwether trials or actually

25  bellwether motions to dismiss based on different state

1   laws.  And if we can't settle the case early on, the

2   results of those bellwether motions will educate the

3   parties to the strength or weakness of the case.

4        I'm from California, I know the law is very

5   strong on consumer protection.  We would presume we'd be

6   suggesting California as one of the states involved in a

7   bellwether motion to dismiss.  I'm sure defendants would

8   have different opinions and be selecting states where

9   their position is perhaps stronger.  And that would

10  educate us.

11       If we can't settle it in mediation, we can see

12  what the court rules on various state laws.  Some may

13  dismiss, some may not, but I think that would be very

14  educational.

15       And we would-- if the cases don't go farther, we

16  could have bellwether-- call them trials, but hearings

17  on class certification.  Hopefully it won't go that far

18  and we can settle this case and get compensation for the

19  affected pet owners.  But do it state-by-state, perhaps

20  six states, perhaps the court would suggest some states.

21  That would be obviously in the court's discretion.

22       But we think that's helpful.  We've done that in

23  other cases and it's been very helpful and it's reduced

24  the enormous amount of work that both sides would have

25  to do if they did it nationwide or 40 states in one

```
1   motion to dismiss.  I hate to see what those papers
2   would look like, and I'm sure the court wouldn't
3   appreciate having to deal with perhaps 40 different-- in
4   effect 40 or 30 different motions to dismiss because it
5   would be different under the laws of different states.
6        I'll pass (4) because the court-- we've heard of
7   the court's procedures on discovery.
8        Protective order is very important and we
9   negotiated a proposed protective order in the California
10  case, it's been modified.  I think that won't be a
11  problem because we're going to get discovery and we're
12  going to need a protective order and ESI protocol.
13       In terms of proposals on fees and expenses, we
14  have submitted a proposal which narrowly confines what
15  attorneys can bill for, agrees that the total fees if
16  there's a common fund settlement would be limited to
17  25 percent and as long-- with other attorneys have
18  agreed that, for the most part, work done prior to
19  leadership decisions would not be billed for.  But I
20  think it's a fairly standard and very acceptable form of
21  fee agreement.
22       In terms of the breadth of state laws, as I've
23  indicated, we have filed for 33 states.  There are even
24  more by some of the other counsel and we think the
25  bellwether technique would be very helpful given the
```

1   number of state laws involved.

2        I know the court has also asked on Page 2 of its

3   order on certain issues relevant to leadership, I assume

4   the court would want to hear argument of that later so

5   I'll pass on that.

6             CHIEF JUDGE ROBINSON:  Correct.

7             MR. SCHUBERT:  Thank you.

8             CHIEF JUDGE ROBINSON:  All right.  Thank you.

9   And Ms. Schwartz.

10            MS. SCHWARTZ:  Mr. Mason.

11            MR. MASON:  Good morning, Your Honors.  Gary

12   Mason for the Mason Schwartz Reese Group.  And we've had

13   two meet-and-confer sessions with defense counsel that

14   the Mason Group arranged and all of the plaintiffs'

15   lawyers were able to participate.  So what you're

16   hearing today, no surprise, there's a lot of consistency

17   at this point thankfully of what the plaintiffs expect

18   in this case.

19        So I won't go again into the same details that

20   everyone else did, but I would like to just quickly

21   address No. (1) and (7), early mediation and the breadth

22   of the complaint, because I think these go together.

23        One of the things that we have learned in our

24   experience, Your Honor, and as Mr. Kamber said earlier,

25   is that in order to mediate successfully, you also have

1    to be prepared to litigate.  There's just no question

2    about it.  And one great example about that is Judge

3    Breyer in the recent *VW* case, obviously a mega case.

4    But nonetheless, they immediately from the start went on

5    two tracks, a litigation track and a mediation track.

6    And we think that's very important here that we somehow

7    balance these two tracks.

8         And we've spoken to defense counsel about that,

9    saying of course we're interested in early mediation.

10   Plaintiffs' lawyers are always interested in that,

11   that's in the best interest of our clients and the

12   class.  But at the same time, we have to be mindful of

13   what litigation does, which makes sure that you have

14   good value from the mediation.  And we can do this in a

15   way that accommodates both sides.

16        For all the reasons you've heard already, this

17   group is very prepared to move forward quickly for

18   mediation.  We agree with defense counsel that by

19   August 30th.  They need to select a mediator even sooner

20   because good mediators you can't get for 60 days.  So if

21   we're going to get a good mediator, that has to happen

22   almost immediately.  And we're prepared to facilitate

23   that with them.

24        But at the same time, we have to push this

25   litigation forward.  And one of the most effective ways

 1   to do that, really the best practice in a consumer class

 2   action, is to put out that consolidated amended

 3   complaint, because it is going to be intimidating and

 4   it's going to be-- it's going to drive a lot of what

 5   happens in this case.

 6        As Mr. Schubert said, there are already two

 7   massive complaints in this case.  Mr. Schubert's group

 8   put together a 33 plaintiff-- or they represent 33

 9   plaintiffs, 33 states.  The *Alberto* case has something

10   like 256 plaintiffs representing 44 states.

11        We will within 30 days of August 19th submit a

12   carefully vetted consolidated amended complaint that has

13   at least 48 states.  To my knowledge, we don't have

14   clients from South Dakota or North Dakota, but 48 states

15   and the District of Columbia and embracing all the

16   various counts.  And that's going to drive a lot of what

17   happens next.  It doesn't have to be fast because we

18   want to accommodate the mediation, but that consolidated

19   complaint is going to be the driver of maximizing the

20   value.

21        And for one reason is because-- I strongly

22   disagree with defendants about national class actions.

23   I've been doing this for 30 years.  And while it's

24   absolutely true you can't get a national class action

25   because of variations of state law, the best practices

1   is to focus on each state.  We're not going to have

2   variations of state law because we have representatives

3   from every state that can go forward independently.

4        The motion to dismiss unfortunately, Judge, is

5   going to be a lot of work.  We've done this many times.

6   Judges are now these days generating 250-page opinions

7   on motions to dismiss.  Why?  Because they're going

8   through carefully, with the help of their excellent law

9   clerks, state-by-state, count-by-count, you know, what

10  happens.  And we're going to lose some, we're going to

11  win some.

12       We're going to get through that and then there's

13  going to be-- if it's litigated, there will be class

14  action practice and a motion for class certification

15  that covers all those states and all those counts that

16  have survived the motion to dismiss, which is going to

17  be many of them.  And there will, once again, be a

18  massive opinion on class cert and there will be some

19  states that survive and some don't.  But that is the

20  process that we're seeing these days time after time

21  with the recent *Marriott* case, the recent *Equifax* case

22  that's driving this litigation.

23       So that's basically, Your Honor, (1) and (7).

24  And we're prepared to do both of those things, move

25  quickly with mediation, move quickly forward with a

1   consolidated amended complaint with great class

2   representatives who are committed to move this action

3   forward.

4         My last point, Your Honor, because no one else

5   has said it, is that this case isn't all about actual

6   damages, it's not all about out-of-pocket costs for

7   veterinary bills and the value of a dead dog let's say.

8   The case is also about the value-- refunding the monies

9   paid by consumers whose pets weren't injured.  And that

10  runs through all those complaints.

11        Many of our co-counsel only represent people that

12  were uninjured, which is great, because that is what our

13  consumer cases are generally about these days.  It's

14  about the economic losses and the-- losing the benefit

15  of the bargain, paying a premium price for a product -

16  and this is a premium dog food - and you didn't get what

17  you paid for.  And that's something you didn't hear the

18  defense counsel talk about this morning.

19        I could tell you right now they have very little

20  interest in settling on that basis.  It's going to be a

21  big issue at the mediation.  On the other hand, it's a

22  huge issue on the plaintiffs' side.  We spend a lot of

23  time pursuing those kinds of cases.

24        On Friday the Ninth Circuit Court of Appeals

25  reversed a denial of class certification on this very

1    issue saying that a class should and can be certified

2    where the kinds of damage you're seeking are

3    point-of-sale damages as opposed to actual injury

4    damages.  So we have a lot of momentum on this issue on

5    the plaintiffs' side.

6         And if we're going to maximize value in this

7    case, it's not just about the out-of-pockets which

8    they're-- as they've said, they've already taken care

9    of.  It's also about refunding the cost of this product

10   or the premium paid for this product.  And we're not

11   going to get the full maximum value out of this unless

12   we also focus on the litigation and move that-- maybe

13   not-- doesn't have to be hyper fast, but it has to move

14   along at a nice clip as we work on the mediation.

15        And, Your Honor, I'm not going to spend the time

16   going through (2) through (6), I think you've heard that

17   three times now.  As I said, there's been a consensus on

18   most of these points.

19        I do want to say just one point on Point (6) with

20   the fee protocol.  I'm liaison counsel in the *OPM* case,

21   privacy case, with Stueve Siegel in Washington.  My role

22   in that case happens to be the guy who has to look over

23   the time each month.  And we would have that kind of

24   protocol here.

25        Someone has to do it and you have to review this,

1    an attorney has to review the time each month that gets

2    submitted by-- even if you're paying attention and

3    supervising all of this, it's still best practice to

4    review everybody's time, make sure it looks like right.

5    Make sure people are doing what they're supposed to be

6    doing, not doing what they're not supposed to be doing

7    to keep the time under control.

8            This is a relatively small case, as Mr. Kamber

9    said.  This is not going to be that much of a challenge,

10   but we still want to do it right.  Thank you, Your

11   Honors.

12           CHIEF JUDGE ROBINSON:  Okay.  Thank you.

13           JUDGE JAMES:  Mr. Mason, just to be clear,

14   are you saying you think the case can be ready for

15   mediation by the end of October or do you disagree on

16   that?

17           MR. MASON:  No, I agree.  I think that--

18   we've talked about expedited discovery.  And, look,

19   you're always going to have issues with expedited

20   discovery.  Right?  You have issues with the discovery.

21   But in fairness to defense counsel, they are offering

22   things that they can readily provide naturally, and

23   that's good.

24           You know, we can quickly learn about the contours

25   of the recall, what was recalled, how they're doing with

1   their remediation program to date, all the things you

2   need-- that you typically need to resolve a case like

3   this.  Are they providing all the information that we

4   would want about things that aren't recalled, the

5   missing bags of pre-mix that's rumored that maybe

6   accounts for this concern that there's more product that

7   ought to be recalled because they haven't accounted for

8   every bag yet?  I've read that on the Internet so it

9   must be true.  And, you know, there's questions like

10   that.

11           But are we going to resolve all those questions

12   by October?  I doubt it.  Can we get ourselves set up

13   effectively to start the mediation process?  Absolutely

14   we can do that.  And what happens then-- look, you know,

15   if they want to give 100 percent relief and they want to

16   give-- you know, refund 100 percent for every can that

17   they ever sold, we don't really need a lot of discovery,

18   you know, we'll be in good shape.  But that doesn't

19   happen in real life.

20           So we'll go in, we'll go in open-minded.  We'll

21   consider what they have to do.  But we have to be

22   prepared to go the distance, because it just--

23   experience says you're just not going to give

24   100 percent that first day of mediation.  And we have to

25   be prepared to put pressure on to get what we need, do

1    what we need to do to get the maximum value for our

2    clients.  Without further-- any further questions, Your

3    Honors?

4              CHIEF JUDGE ROBINSON:  No. Thank you.

5              MR. GOETZ:  Your Honor, may I have two

6    minutes?

7              CHIEF JUDGE ROBINSON:  Yes.  Go ahead, Mr.

8    Goetz.

9              MR. GOETZ:  I just want to address four

10   points, Your Honor.

11        On the timing of the mediation I think we're all

12   in agreement; we want to move as fast as possible.  We

13   do know that there are issues that could delay things

14   such as the availability of a mediator.  What I believe

15   you've heard from everyone today, let's move it as fast

16   as we can.

17        In terms of a motion to dismiss, you've heard

18   different positions by the plaintiffs, with the Blaser

19   firm saying don't defer it and I think everyone else

20   saying it's pretty complicated.  Because while the

21   Blaser firm said you should defer choice of law, I think

22   you've heard from the other plaintiffs' firms you can't

23   on the motion to dismiss unless you're going to stick

24   strictly to a *Twombly* and *Iqbal*-type motion.

25        So I think most of the people in the courtroom

1    agree that postponing a motion to dismiss makes sense,

2    particularly when we're looking at an early mediation.

3           Discovery.  We want to do discovery.  It needs to

4    be informal to make it move quickly and it needs to be

5    both ways.  It needs to be both ways in the sense that

6    we need to know what the allegations of each of these

7    plaintiffs is about their pet, and we've prepared and

8    circulated a fact sheet for them to complete.  And

9    obviously we'll work with any leadership counsel on that

10   fact sheet, but we need prompt responses to that fact

11   sheet.

12          CHIEF JUDGE ROBINSON:  When did you circulate

13   that and did you ask for them back on a particular time

14   frame?

15          MR. GOETZ:  We haven't asked for anything

16   back.  We have circulated it within the last couple of

17   weeks.  And the point was:  Start looking at this.  But

18   obviously you need to have your leadership appointed

19   before we can have definitive discussions on it.

20          And it's not just the fact sheets.  Those fact

21   sheets are about the plaintiffs who claim - and that's

22   what the plaintiffs are in this case, the many different

23   plaintiffs represented here - that their dogs consumed

24   the recalled product.

25          Now, you've heard a little bit today that maybe

1   some in the plaintiffs' group would like to go beyond

2   the recalled product, others would not.  We need to know

3   which way is this litigation going, and that's something

4   that the leadership will decide.

5        If they wish to go beyond the recalled product,

6   we need to know the SKU numbers and other information so

7   that we can investigate the claims.  We have asked for

8   that information, we have not been provided it.

9        So that's part of the two-way discovery if that's

10   the fork this litigation takes.  I would suggest that's

11   not a wise fork.  But if that's the fork that it takes,

12   we need to see what these claims are based on.

13        And finally on refunds, that's another fork.  We

14   are refunding.  We are refunding all of the purchase

15   price for the recalled product.  We have done that

16   voluntarily and we have paid much of that money out and

17   we are welcoming customers to tell us what they bought

18   and we will refund it 100 percent.

19        The question that you've heard alluded to here is

20   different.  It's will this case be not just about the

21   recalled product as some of the plaintiffs have told you

22   it should be, but should it be about all of Hill's

23   products?  Is there a price premium theory, that they

24   will say:  You have sold your products for too much

25   money.  And even though I bought a product that wasn't

1    recalled and my pet consumed it and it helped my pet, I

2    think I paid too much money, somehow tied to the recall.

3    That's a very different piece of litigation.  And you've

4    heard disagreement in the plaintiffs' group on whether

5    this should be that.

6         I will just say this on that:  The cans of

7    product don't say anything about what the plaintiffs

8    have based their claims on.  Did you test for Vitamin D?

9    These aren't cans that say, hey, we test for Vitamin D.

10        So what the plaintiffs are going to try to create

11   here is in the course of discovery something that has to

12   do with a website claim, for example, that we do test.

13   We test for some key nutrients.  We test for mitotoxins,

14   we test for fungus, we test for metals.  Somehow does

15   the fact that we disclosed that information on our

16   website mean that folks thought when they purchased the

17   product that we tested every shipment from a supplier of

18   pre-mix for Vitamin D.

19        Now, I would submit that's a pretty strained

20   claim, but it's not the typical claim that you see in a

21   price premium where you said something on your label and

22   what you said was not true.  That's not this case.

23        So the plaintiffs have to decide do they really

24   want to take that on.  Do they want to take that on as

25   part of this litigation?  And we don't know because

1   we've been told inconsistent things.  We've been told by

2   some "yes" and then they changed their mind and said

3   "no."  And you've heard in this courtroom already today

4   from some plaintiffs who say, no, let's just talk about

5   the recall.

6        And let's be clear, we're talking about a

7   mediation to address the recalled products.  We're not

8   talking about a mediation to address a claim that

9   somehow our products in some plaintiffs' minds are too

10   expensive, despite the fact that they bought them at the

11   price that they were advertised for and they used them

12   for the purpose that they were advertised for and it

13   worked exactly as advertised on the can.

14        I think I'll leave it at that.  There's so much

15   more I could say on this issue, there's more I could say

16   on the class issues, the choice of law, the many

17   complications we have ahead of us.  But I think it's

18   fair to say let's put those off for now, let's see who

19   we're dealing with.  Can we get a consistent voice on

20   the plaintiffs' side, do we know what the case is about.

21   And then let's see if we can mediate it to a conclusion.

22        And I'll end where I started, which is we're

23   putting money in our customers' pockets.  We have paid

24   many, many claims.  We have refunded the purchase price

25   for folks who said we didn't consume product.  We have

1   paid for veterinarian bills for folks who said we had

2   our dog tested because they consumed the product and the

3   tests showed they weren't harmed.  We've paid those

4   bills and we're going to continue to pay those bills as

5   customers submit them.  Thank you, Your Honor.

6           CHIEF JUDGE ROBINSON:  All right.  Thank you.

7   All right.  Well, this has been helpful.  As we run

8   through the agenda items, I think I have a good sense of

9   where areas of agreement are and where there's some

10  differences at least among the plaintiffs as to how to

11  proceed.

12          It sounds like everyone is on the same page in

13  terms of pursuing early mediation.  But, you know,

14  obviously some different views as to what discovery

15  needs to take place to inform that mediation and whether

16  discovery should continue even if it's beyond the scope

17  of informing the mediation at the same time that we're

18  on a mediation track.

19          So I encourage you to continue to meet and

20  confer, talk about this in your joint status report on

21  August 12 and we'll talk about this obviously much more

22  on August 19th.

23          I'd also like you to address in the joint status

24  report and on August 19th whether there will be a need--

25  or whether you perceive that there will be a need for a

 1    common fund, common benefit fund and, if so, what the

 2    process ought to be in terms of determining the

 3    parameters of that.

 4          You all have I think addressed your views of the

 5    appropriate timing for submission of proposed protective

 6    orders, ESI protocols, document retention orders and the

 7    like.

 8          I'd like Judge James to share-- one of the agenda

 9    items was the court's view on discovery disputes in

10    particular, but I'd like you to share your views on that

11    as well as any other things that you'd like the parties

12    to hone in on for purposes of the next hearing regarding

13    discovery.

14          JUDGE JAMES:  Thank you.  First I would just

15    like to reiterate what Judge Robinson has said.  Since

16    coming on the bench, I've only been involved in one MDL.

17    As Judge Robinson mentioned, that was the-- or is the

18    *EpiPen* case.  It's been a real pleasure.  I've enjoyed

19    it because of the complexity of the issues and the fact

20    that counsel in that case are very skilled and talented

21    in these sorts of cases.

22          And from the resumes, firm resumes that have been

23    submitted and the personal bios that have been submitted

24    in this case, I see we have the same high level of skill

25    and expertise in this case.  So I look forward to

1   working with all of you in this case.

2         I can also say that as a lawyer in private

3   practice, I had the great pleasure of having a number of

4   cases in front of Judge Robinson.  And I know from those

5   experiences that she is what I would call a lawyer's

6   judge, and I know you'll enjoy working with her in this

7   case as well as I will.

8         So having said that, I should give you an idea

9   how I view discovery disputes.  I will tell you that

10  although-- most of you probably know that, unlike our

11  friends across the river in the Western District of

12  Missouri, Kansas does not have a local rule that

13  requires you to contact the magistrate judge before

14  filing a motion to compel.  Our local rules - and I

15  commend to you our Local Rule 37 - do, however, require

16  you to confer in good faith with opposing counsel before

17  filing any motion to compel.

18        I will tell you that I read into that a footnote,

19  which is that good-faith conferring by my standard

20  requires you to actually talk to each other.  So don't

21  file a motion to compel with a long string e-mail

22  attached.  I'm old and old-fashioned and I expect you to

23  actually pick up the phone or meet with, in any event

24  talk with opposing counsel before filing any sort of

25  discovery motion, motion to compel.

1          Further to that issue about a conference prior to

2     filing any motion to compel, although, as I said, we

3     don't have a local rule requiring you to contact me or

4     the magistrate judge before filing a motion to compel, I

5     actually do encourage and welcome counsel to call or

6     e-mail my chambers prior to filing any motion to compel.

7          Typically what happens then is that if I feel you

8     have conferred in good faith and attempted to resolve it

9     in good faith, typically then I will set a phone

10    conference and also set a deadline maybe a day or two

11    before that phone conference by which each party may

12    send me an e-mail, not filed, but an e-mail sent to

13    chambers, no more than two or three pages summarizing

14    what the issue in dispute is or issues in dispute are

15    and what your position is so that I can be prepared and

16    we can have a meaningful phone conference to discuss the

17    issue.

18         So that's kind of my ordinary MO on these

19    matters.  Of course, that's complicated a bit in these

20    MDLs where you have so many counsel and parties

21    involved.  So we have to work through those issues and

22    be sure the proper spokespeople are on the phone who can

23    drill down on the issue, but we've worked through that

24    pretty successfully in the *EpiPen* case without a lot of

25    need for phone conferences.

1        I find that in these cases you all are so capable
2    that-- I know you all know, as my experience was in
3    private practice, that usually it's easy to work out
4    solutions when you have good lawyers on the other side
5    than when you have people who are less experienced.  So
6    I expect you all to usually be able to work out your
7    disputes without my involvement, but I'll be here if you
8    need my help.
9        I guess the only thing I would say at this point
10   otherwise is that I'm most interested in-- since
11   everybody seems to be in agreement that an early
12   mediation of some sort is in order in this case,
13   obviously the real issue that we need to concern
14   ourselves with in that regard I think is what sort of
15   discovery needs to occur in order to make that mediation
16   meaningful.
17       And I hope that you all can quickly make
18   decisions on voluntary disclosures.  I know that initial
19   disclosures have occurred in I think four cases, most of
20   them in California I think, but I'll be interested in
21   you all not only doing your initial disclosures globally
22   but also voluntarily exchanging the appropriate
23   documents and completing plaintiff fact sheets quickly
24   so that mediation can be fruitful.  I think that's all I
25   have now.

1          CHIEF JUDGE ROBINSON:  All right.  Thank you.
2    Do any of you have any questions?  All right.  I see
3    not.
4          So a couple of things I'd like to cover with you
5    and then we'll take about a 15-minute break and then
6    we'll come back and start with the presentations by the
7    various groups on their leadership applications.
8          One is that motions for pro hac vice are not
9    necessary.  Counsel need not retain local counsel,
10   although you're certainly welcome to do that.  And
11   that's something that was covered in the Preliminary
12   Practice and Procedure Order.  But you all do need to be
13   sure to register for electronic filing in the PACER
14   system and so that you can receive any e-mails that the
15   court may send to all counsel of record.
16         For cases that have been transferred here, you
17   should've received a letter from our attorney
18   registration folks that provided you with instructions
19   on how to get registered in the District of Kansas to
20   receive e-mail notifications regarding filings, those
21   instant notifications, NEFs we call them.
22         If you did not get that information, talk to Ms.
23   Wiest on the break or when we finish today.  And if you
24   have any questions about how to accomplish that, the
25   Preliminary Practice and Procedure Order points you to

1    the person here in the district who will answer your

2    questions about that.  She's in the clerk's office, her

3    name is Gretchen Welk.

4         All right.  Any questions about any of that?  All

5    right.  I see not.

6         All right.  So why don't we take a 15-minute

7    break.  When we come back, we're going to take up the

8    all important issue of appointment of leadership

9    counsel.  I'd like to start by giving each group 20

10   minutes, and that would include any individual remarks

11   on behalf of individuals within that group.

12        Obviously we may go beyond that, we may have

13   additional questions for you.  But let's at least start

14   with a 20-minute block of time for each group that's

15   presenting.

16        All right.  So it is almost 10:30, let's plan on

17   reconvening at 10:45.

18             (Recess).

19             CHIEF JUDGE ROBINSON:  All right.  You can be

20   seated.

21        All right.  So we are now going to take up the

22   applications for leadership roles in this litigation,

23   which is obviously the primary focus of our hearing

24   today.

25        Essentially what I'm called upon to do is to

1    select fiduciaries in this litigation.  And I also know

2    that who is selected has a profound financial effect as

3    well on the litigation and on the individual lawyers.

4    So I just want you to know I take this decision very

5    seriously and that I intend to get a written order of

6    appointment out later this week.  So in just a few days

7    after today's hearing you'll all know who the leadership

8    group will be.

9         So why don't we start with the MRS Group.  And

10   again, 20-minute presentations thereabout, we'll have

11   some follow-up questions either after you each

12   individually speak or at the end.

13        All right.  Ms. Schwartz.

14             MS. SCHWARTZ:  Good morning, Your Honors.

15   Rachel Schwartz from Stueve, Siegel, Hanson.  And on

16   behalf of the Mason-Schwartz-Reese Group, thank you for

17   the opportunity this morning to address the court.

18        We do not want to repeat our application, but on

19   behalf of our group, Mr. Mason, Mr. Reese and I want to

20   address the court's questions and to emphasize a few

21   unique aspects of our team's experience, composition,

22   and our leadership approach.

23        Now, before the court are an enormous number of

24   well-qualified attorneys.  And the challenge for the

25   court is to decide not only who has the ability to lead

1   the litigation but which attorneys will work well

2   together in prosecuting this MDL on behalf of all of the

3   plaintiffs.  And our group has all of these

4   qualifications.

5          Now, with regard to our experience, our group has

6   a long history of successfully prosecuting and resolving

7   consumer protection class actions around the country.

8   We have filed those in courts around the country and we

9   have an unparalleled record of success with class

10  actions here in this district.

11         Now, the attorneys in our group have held

12  leadership roles in some of the largest consumer

13  protection class actions ever filed.  We have

14  successfully briefed the types of complex and disputed

15  legal and factual issues that will be at the forefront

16  of this litigation.

17         For example, as you saw in the defendant's

18  statement of the case and you've heard already this

19  morning, one of challenges in this case will be class

20  certification.  It's not unusual to have defendants say

21  that class certification is an impossibility.  And our

22  group has confronted this and overcome those challenges

23  in cases around the country.

24         For example, in this district in the *Syngenta*

25  MDL, we succeeded in certifying not only a nationwide

1   class but individual state classes as well, and

2   certification had been denied in the most analogous

3   previous case and yet we were able to overcome that.

4        And in April in the Eastern District of New York,

5   Mr. Reese's firm was successful in overcoming similarly

6   strong opposition to class certification and he was able

7   to certify a class of Gerber baby food purchasers who

8   claim to have been misled by representations about the

9   formula.  Claims that are very similar to what we'll be

10  dealing with here in this litigation.

11       Now, our collective class action success as

12  detailed in our application is why attorneys in our

13  group have been repeatedly lauded by our peers for our

14  litigation and class action experience.

15       For example, our peers in the plaintiffs' bar

16  have selected Gary Mason to co-chair the class action

17  litigation group for AAJ, the country's premier trial

18  lawyer association, and he presently serves as the

19  chairman of the Rule 23 task group.

20       But beyond just our class action and consumer

21  protection experience, we have real meaningful

22  experience in food and dog food issues that are going to

23  be at the forefront of this litigation.  Three members

24  of our group - Mr. Mason, Mr. Schaffer and Mr.

25  Goldenberg - are class counsel in litigation currently

1   pending against a manufacturer of Nature's Recipe dog

2   food products for misrepresentations regarding the

3   quality of that dog food.

4        The litigation has involved testing 75 different

5   products to see if the products actually complied with

6   the labels and the representations about those products,

7   and we'll bring that experience here to this litigation.

8        Mr. Schaffer is similarly prosecuting a series of

9   cases against Champion Petfood which alleges

10  misrepresentations regarding the quality and sourcing of

11  the ingredients for the dog food.  Again, issues that

12  are going to be relevant to this litigation as well.

13       And Mr. Reese has years of food-related

14  litigation experience, brings with two very critical and

15  relevant pieces of prior litigation.  The first is a

16  case filed against one of Defendant Colgate

17  subsidiaries, so he has familiarity with Defendant

18  Colgate.  And the second is a case against DSM

19  Nutritional Products, which is the supplier alleged to

20  have provided the pre-mix in this case that had excess

21  Vitamin D.  He even teaches a class on food law.

22       Now, because of all of our food-specific and our

23  consumer protection experience, we have already retained

24  experts on both liability and damages issues and we have

25  extensive experience working with these experts on the

1   very legal and factual issues that will be in dispute in

2   this MDL.

3       Now, as to whether the MSR Group will work well

4   together, our group is composed of attorneys who have a

5   long history of working cooperatively and efficiently

6   together.  This is not a group of lawyers coming

7   together for the first time in a case.

8       And because of our history, we have a very

9   specific shared vision for how our proposed co-leads and

10  our executive committee will function, which the court

11  has inquired about.  We do not intend that all seven of

12  our attorneys will work on every aspect of this case.

13  Because of our history, we're aware of our individual

14  strengths and how best to deploy our resources in the

15  best interest of the classes.

16      As evidence of our commitment to efficiently

17  prosecute this litigation, we are the only group that

18  has proposed a leadership structure that has a co-lead

19  simultaneously functioning as liaison counsel.  We

20  believe this is consistent with Local Rule 5.4.2 and

21  will ensure in this litigation that the attorney with

22  the best knowledge of the district's guidelines and

23  practices is meaningfully participating in all aspects

24  of this litigation.

25      We deliberately decided on our three co-lead

1   structure to ensure we have the capacity to represent

2   the classes not only in ongoing settlement discussions

3   but simultaneously in prosecuting the litigation.

4         At the onset the work will be concentrated among

5   the three co-leads.  Mr. Mason and Mr. Reese will be

6   focusing on vetting and working with all class counsel,

7   all plaintiffs' counsel in the case to find the best

8   class representatives for the classes and they will be

9   working on finalizing the consolidated complaint.

10        And as I did in the *Syngenta* litigation, my

11   initial focus will be taking the lead on drafting the

12   governing orders for this litigation, such as the

13   protective order and the ESI protocol, and meeting and

14   conferring with defendants on these orders and to

15   finalize the initial discovery needed for productive

16   mediation.

17        Now, if this litigation proceeds to full

18   discovery, we know from our collective experience in

19   prosecuting nationwide and state class actions the legal

20   horsepower you need to produce class representatives

21   from around the country for discovery, for example.  And

22   our executive committee provides the flexibility to

23   assist as needed with those substantial efforts.

24        We had provided to the court as part of our

25   leadership application an Exhibit 9, which was our

1   proposed time and expense protocol.  This mirrors the

2   protocol that was entered by Judge Lungstrum in the

3   *Syngenta* litigation and it again reflects our commitment

4   to the efficient and streamlined prosecution of this

5   litigation.

6        Now, the court has asked about the involvement of

7   litigation funders.  And the answer for our group is

8   simple:  We have not and will not work with outside

9   litigation funders in this litigation.

10        The creation of our group was guided by the Duke

11   guidelines which recommend that lawyers appointed to

12   leadership positions must not only be capable and

13   experienced but must "responsibly and fairly represent

14   all plaintiffs, keeping in mind the benefits of

15   diversity of experience, skills and backgrounds."

16        Our group varies by age, gender, race, and

17   geographic location.  We have proposed a team of seven

18   attorneys, three of whom are women.  And our group

19   understands that this diversity of our background and

20   our experiences makes us stronger and better to

21   represent all of the classes.

22        By way of one example only, some of defendant's

23   labeling was in Spanish which means it's very likely

24   we're going to have Spanish-speaking class members.

25   Proposed executive committee member Rosemary Rivas is

1   fluent in Spanish and will be of enormous assistance

2   when we're working with class members who may have

3   Spanish as their first language.

4        But at the end of the day, we have not asked the

5   court to merely take our representations about the

6   quality of our work and our ability to work

7   cooperatively.  We've provided judicial references from

8   this district and from around the country so that the

9   court can hear firsthand about the qualities of the

10  attorneys in our group.

11       And to answer the court's question; as we

12  expressly stated in our application, we remain willing

13  to work with other attorneys in this litigation and

14  specifically suggested that the court could add

15  additional attorneys to our slate.

16       We have a history of doing this successfully.  By

17  way of example, in the *OPM Data Breach* case, Gary Mason

18  was part of the appointed leadership but my firm was

19  not, but we were entrusted with important tasks

20  throughout that litigation.

21       Similarly, in the *Syngenta* litigation Judge

22  Lungstrum added Tom Bender to our slate and we fully

23  embraced the opportunity to work with Mr. Bender.  And

24  at the end of the day, outside of the co-leads and the

25  class counsel, his firm had the most time in the case

1    because of the great work he did.  And we would continue

2    those same efforts here to work with any lawyers the

3    court believed would be appropriate to add to our slate.

4         I want to make one last point before I turn this

5    over to my co-counsel, Gary Mason.  We want to discuss

6    the work that we've done in this litigation because we

7    believe it exemplifies our approach going forward.

8         We filed the first case in February and we were

9    the first case to name Colgate as a defendant.  The

10   *Alberto* case, which was filed here in this district,

11   covers the greatest number of states, 44, and the

12   greatest number of plaintiffs, more than 250.  This is

13   reflective of our boots-on-the-ground proactive approach

14   to litigation.

15        Now, since the creation of the MDL, we've

16   continued those leadership efforts by coordinating among

17   all plaintiffs' counsel to comply with the court's

18   Preliminary Practice Order.  Our work has included

19   drafting the fact section of plaintiffs' preliminary

20   statement, incorporating and reconciling changes from

21   other plaintiffs' counsel, and finalizing that document.

22        We additionally drafted the initial joint

23   proposed agenda.  We again incorporated changes from

24   other counsel and then led the two meet-and-confer

25   conferences with defendants about that agenda.  And

1    we've worked with the court's chambers on the e-mail

2    distribution list as well.

3          This isn't necessarily the most glamourous work

4    in litigation, but we believe it's necessary work to

5    ensure the prosecution of an MDL involving more than 80

6    plaintiffs' attorneys and hundreds of class

7    representatives.  Our group will continue this same

8    proactive inclusive approach going forward in leading

9    this litigation.

10          And the final aspect of our group that I want to

11   emphasize is that we have a district-focused approach to

12   this litigation.  While this is an MDL, this is at its

13   core a series of cases pending in this district, subject

14   to this district's local rules, guidelines, and

15   practices.

16          And I and my firm have a long history of work in

17   this district and we've encouraged the court not only to

18   contact judges in the district, but the court-- but the

19   clerk's office as well to learn more about our approach

20   in leading MDLs.

21          But we're not alone.  Ms. Rivas is part of the

22   leadership group in the *EpiPen* litigation pending before

23   Judge Crabtree and Judge James and again brings

24   additional familiarity with the district's rules.

25          And we've put our approach into practice already.

1    When the plaintiffs' groups began discussing a proposed

2    protective order, our approach was to start with the

3    district's model protective order and tailor that order

4    to the unique needs of this case, rather than starting

5    with a protective order that originated from outside of

6    this litigation that may not be consistent with the

7    expectations of this court and this district.

8         I am happy to answer any questions that the court

9    may have.  If none, I'm happy to turn this over to my

10   co-counsel, Gary Mason.

11        CHIEF JUDGE ROBINSON:  Can you speak to what

12   other counsel support the application of the MSR Group?

13        MS. SCHWARTZ:  Sure.  We had added a footnote

14   in our brief that indicated additional firms that had

15   supported us.  I think it may have been Footnote 1 in

16   our leadership application.  And that includes not only

17   local firms here in the district but national firms as

18   well who, although they are not seeking independent

19   leadership roles, have found that we would best

20   represent the interests of all of the classes.

21        CHIEF JUDGE ROBINSON:  All right.  Now, Mr.

22   Mason has-- so Mr. Mason is going to speak.  Anyone else

23   from your group going to speak?

24        MS. SCHWARTZ:  And Mr. Reese will speak

25   briefly as well.

1          CHIEF JUDGE ROBINSON:  All right.  I would

2    like someone just to address the four people that

3    you've-- are suggesting for the executive committee as

4    well and, you know, what their specific talents and

5    skills are and what they bring to the table.  You've

6    already addressed one thing at least that Ms. Rivas

7    brings to the table.  But either you or one or the other

8    two, Mr. Reese or Mr. Mason, if you would address that

9    as well.

10          MS. SCHWARTZ:  Sure.  And I'm happy to

11   address that.  What we looked for in assembling this

12   group is people with a depth of experience in

13   prosecuting consumer protection class actions.  And all

14   four of the members on our executive committee, that's

15   what they've dedicated their professional careers to and

16   they bring different strengths with them.

17          We have a history of working with all of them

18   that brings a comfort level as to their skills and

19   abilities, but those skills and abilities include Mr.

20   Schaffer and Mr. Goldenberg's experience in pet cases

21   that is a nice complement to the experience that Mr.

22   Mason and Mr. Reese bring.

23          Now, Ms. Rivas, in addition to her language

24   expertise, also brings a particular expertise in notice

25   programs.  And this will be a complicated notice program

1  in this case because there isn't a comprehensive list of

2  all of the people who purchased these products and so

3  trying to look forward in the litigation towards a

4  program that will get the most number of people involved

5  and compensated through this litigation, and she has

6  particular expertise with that.

7        And Ms. Rivas-- and Melissa Emert brings a

8  substantial body of experience in leading consumer

9  protection actions around the country dealing with

10  defective products, which is effectively what we're

11  looking at here.  She has been appointed multiple times

12  to lead large MDLs and will bring with her that

13  experience.

14        We look at the executive committee as the support

15  for the three co-leads.  They, if we move into

16  litigation, will help on everything including

17  depositions, gathering documents from class plaintiffs,

18  which if we're talking about class plaintiffs across

19  multiple states and nationwide is a large-- a large

20  task.  One that we just completed not long ago in

21  *Syngenta* and are fully aware of what all that entails.

22        And that's the type of expertise that our team

23  brings with them, is they've done this before, they know

24  how to efficiently approach document collections,

25  depositions, and they all have extensive experience

1    working with experts on the very issues that will be in

2    this case.

3             CHIEF JUDGE ROBINSON:  All right.  I think

4    your group, the MSR Group alone, suggests in particular

5    you serving as both co-lead and liaison counsel.  If you

6    could speak to your thinking behind that and including

7    your capacity to do both.

8             MS. SCHWARTZ:  Sure.  Our firm has held that

9    role before in litigation.  So for example in the

10   *Syngenta* litigation, my partner Pat Stueve functioned as

11   both the co-lead and the liaison counsel in that case

12   and we thought it worked very well, because having a

13   person whose only role is to function as a liaison

14   sometimes takes that person out of the loop of the

15   litigation.  They're not part of the decision-making,

16   they may not necessarily be adding input, for example,

17   as to expectations for what briefings should look like

18   in this district.  You want that input at the very

19   beginning, not coming at the end when it's time to file.

20            And our firm is structured in a way to be able to

21   handle those responsibilities.  We've done it before and

22   would propose to be able to do the same here.

23            We have staff members who have long-term

24   relationships with the clerk's office, work very well.

25   We had the pleasure of working with different folks in

1    the clerk's office than who are assigned to this case,

2    but I think they would be able to speak to our work in

3    ensuring all of the plaintiffs are brought into the MDL,

4    that communication is facilitated amongst all of those.

5         And we've already put into place easy ways to

6    make those communications happen.  We've set up a

7    ListServ for all of the plaintiffs in this case so that

8    we can effectively and efficiently communicate with all

9    80-plus attorneys using just a single e-mail.  It's a

10   very effective way to keep everybody in the loop and

11   aware.

12        And I would anticipate, having helped on many of

13   those responsibilities in the *Syngenta* litigation, that

14   there would not be a problem to be able to handle both

15   of those responsibilities here.

16        CHIEF JUDGE ROBINSON:  All right.  Do you

17   anticipate having leadership subgroups or subcommittees?

18        MS. SCHWARTZ:  We do not.  We do not think

19   that this is the type of case that needs that level of

20   structure.  This is certainly a smaller case than the

21   *Syngenta* MDL and we were not even that formal in the

22   *Syngenta* MDL.  Instead what we plan to do here is that

23   folks will help on narrow subsets of the case but not in

24   a formal committee structure that would require

25   unnecessary weekly phone calls or unnecessary weekly

 1   meetings.  We plan to run this much more efficiently,

 2   and our hope is that much of that work can be done by

 3   the three co-leads.

 4            CHIEF JUDGE ROBINSON:  All right.  But your

 5   group-- well, you've already addressed that.  Let's see.

 6            JUDGE JAMES:  Could I jump in with one?

 7            CHIEF JUDGE ROBINSON:  Go ahead.

 8            JUDGE JAMES:  What's your view on-- should

 9   the leadership team and/or the executive committee

10   involve a representative of this putting forth the

11   non-recalled food claims?  Is it important to have them

12   recognized, involved in the leadership?

13            MS. SCHWARTZ:  Whether they're formally

14   recognized, we would work hand-in-hand with those

15   plaintiffs' lawyers because their claims have been

16   transferred to this MDL and their claims need to be

17   considered for potential inclusion into the consolidated

18   complaint, whether there's the possibility as we had in

19   *Syngenta* of separate consolidated complaints that could

20   address issues like that.

21            I think they absolutely have to be part of the

22   process.  We'd welcome them being part of our leadership

23   structure.  But even if they're not, we would absolutely

24   commit to working hand-in-hand with them to make sure

25   that all of those plaintiffs are represented here in the

 1   MDL.

 2            CHIEF JUDGE ROBINSON:  All right.  I think

 3   you have covered everything.  If I think of anything

 4   else, I'll ask Mr. Mason or Mr. Reese.  Thank you.

 5            MS. SCHWARTZ:  Thank you, Your Honors.

 6            MR. MASON:  Thank you, Your Honor.  Thank you

 7   for the privilege of appearing in your courtroom.  It's

 8   my first trip to Kansas City.

 9        Your Honors, I'll be brief.  I've been practicing

10   and have devoted my practice to consumer class actions

11   for almost 30 years.  This is what I do, exactly these

12   kinds of cases.  I was the first co-chair of the

13   consumer practice group at Cohen, Milstein, Hausfeld &

14   Toll in like 1990.  I can't even remember some of the

15   things that, you know, I've done so far.

16        And I was reflecting upon some cases that I

17   wanted to share with the court because I felt during the

18   break that perhaps I said things that would concern the

19   court and make it feel like this is going to be so

20   complex that this will become a 12-year case and not an

21   18-month case.

22        And I want to assure the court that I've been

23   involved in both.  I've been involved in the Chinese

24   drywall case, which has been going on for 15 years, and

25   *Exxon Valdez,* but I've also been involved in cases that

1    have settled very quickly.  And I'm not going to talk to

2    you today about the three cases that I've settled with

3    some of my colleagues behind me just this year.

4         We've settled a case on behalf of Nissan three

5    weeks ago involving three million vehicles, $100 million

6    in value.  I settled within six months earlier this year

7    on behalf of-- a private settlement on behalf of 300

8    people who consumed contaminated almond milk and got

9    sick, very much like these dogs.  No one died

10   thankfully.  But we settled that very quickly, within

11   about six months.

12        With Mr. Schaffer and Mr. Goldenberg, we got

13   involved in a case against MetLife.  And within roughly

14   a two-year period from our involvement, we managed to

15   settle on behalf of 4,000 individuals for claims of

16   breach of a long-term health policy.  But that's not

17   what I want to focus on actually.

18        What I want to tell you about is a case from

19   2017.  Just two years ago this week in The Outer Banks,

20   a contractor severed a power line and took the whole

21   island out of business for ten days at the end of

22   August, causing tens of millions of dollars of economic

23   loss to a very diverse group of people; businesses,

24   homeowners, property owners, tourists.

25        And I'm not going to take full credit for this

1    because I did it with my partner Dan Bryson, but Dan

2    Bryson and I within 18 months from soup to nuts,

3    beginning to end, we got that case resolved.  This was a

4    case like this one involving economic loss.  It was a

5    case like this one where defendants said, how can I

6    settle this quickly?  We're already paying people out,

7    how do we resolve this?

8          And we went to mediation within six months, we

9    had several mediation sessions and ended up settling the

10   case for $10 million and, importantly, we worked very

11   closely with Crawford, an adjustment company.  We

12   brought them into the mediation very early on to help us

13   understand how to adjust and pay off this very diverse

14   group of individual claims.

15         By the end of 2000-- by June of 2018, we had

16   final approval and we had disbursed completely all the

17   available funds, I think it was between 10 and

18   $13 million, by the end of 2018.  A year-and-a-half it

19   took us to get to that case.

20         So we know how to quickly resolve a case when the

21   defendant is telling you they want to resolve the case.

22   We also know how to litigate a case when they're telling

23   you they want to fight it.

24         And to that end, we were invited early on by

25   defense counsel to help out.  They said, you know, Mr.

1   Mason, if you want to help expedite this case, why don't

2   you start getting the data so that you'll be ready for a

3   mediation quickly from your clients.  And we did just

4   that.

5        And we didn't use the 18-page claim form that

6   they recently submitted, we used a much simpler claim

7   form that they're actually using.  As I understand it,

8   it's available on their website.  And we have something

9   like 550 retained clients, we have surveyed them all.

10  We have 350 completed forms.  We know that we represent

11  158 dead dogs.  We know that we have claims that are in

12  excess of $750,000.  And we have fantastic-- that kind

13  of information and in more granular detail, of course,

14  that will allow us to go right into the mediation with

15  defense counsel when they're ready.

16       Your Honor, that's what I wanted to share with

17  you this morning.  We think-- you heard my co-counsel

18  talk about our litigation skills.  We have the mediation

19  skills.  We're actually 110 percent engaged in this case

20  and ready to do whatever is necessary.

21       I thank you for your time and I would just want

22  to cede just a few minutes of my time to Mr. Reese.

23            MR. REESE:  Good morning, Your Honors.  It's

24  is my pleasure and honor to be able to address you today

25  and thank you for the opportunity.

 1          I just wanted to highlight a couple of points and

 2    I do not want to repeat what's already been said.  I'm a

 3    former prosecutor, spent several years as a prosecutor

 4    at the Manhattan District Attorney's Office in New York.

 5    And if there's any insight I gained from that is the

 6    best way to achieve swift and fair justice is to be

 7    tough but trusted.  And that's what I believe myself and

 8    my firm brings to this case.  My firm is many former

 9    prosecutors or other government employees that did trial

10    work.

11          It appears early settlement talks will take place

12    here, and I think that's a very good thing.  But for any

13    settlement to be successful, you need to convince the

14    other side that your case has merit.  And in a class

15    action case, in a class action context, you must

16    convince them that it can be certified for there to be

17    any real meaning to those settlement talks, which appear

18    that that will take place in a private mediation

19    sometime before the end of October here.

20          We are ready to do that, and the reason we are

21    ready to do that is my firm specializes in food law

22    cases.  Ms. Schwartz mentioned earlier, my firm-- I

23    think it's the most recently certified food law case,

24    the *Hasemann v. Gerber* case, which was certified by

25    Judge Brodie out of the Eastern District of New York on

 1   April 1st of 2019 in a contested matter.  Because of

 2   that class certification, that case now is headed

 3   towards mediation and hopefully a settlement.

 4        So we can be tough.  We now how to get these

 5   cases certified.  We know how to get them certified

 6   without much involvement of the court because we know

 7   specifically and are laser-focused as to what discovery

 8   is needed to either convince the other side that this

 9   case has merit, that the claims can be certified, and

10   even do that solely in a mediation context.

11        We're also trusted.  I would note that I've been

12   doing food law cases for over ten years, class actions

13   for about 20.  And prior to that I prosecuted as I

14   mentioned before.  We frequently co-counsel with the

15   Center for the Science in the Public Interest on

16   food-related issues.  We've been doing that for over a

17   decade.  They are probably the premier consumer

18   non-profit advocacy group out of Washington, D.C.

19        I also am asked to speak on a frequent basis both

20   by the plaintiffs' bar as well as the defense bar.  And

21   I think that shows the trust that's put in the work that

22   I've done, my firm has done.  Most recently I spoke at

23   the Grocery Manufacturers Association, which is pretty

24   much a defense bar-only conference, but I was one of the

25   counsel that was asked to speak to basically give the

1   plaintiff's views.

2        I also note that I-- in addition to being a

3   litigator, which is basically my full-time job, I also

4   teach at a law school.  I teach two classes at Brooklyn

5   Law School.  One is on food law and another is on class

6   actions and other aggregate litigation.

7        And I bring this up because I note that I think

8   to have a meaningful settlement discussion you want the

9   other side to trust you.  Ms. Chanoine, who is here, who

10  is opposing counsel, is a frequent guest lecturer at my

11  classes at Brooklyn Law.  I also guest lecture at her

12  food law class at Columbia Law.

13       So we have been doing this for several years.  We

14  have a level of professional trust with each other,

15  which I think actually started first at a food law

16  conference unrelated to academia, but it spilled over

17  into academia and it continues to this day, even into

18  this litigation.

19       So I think the toughness and the trust is

20  something unique that my firm and that I personally

21  bring.  And these are important factors because

22  hopefully this case can be-- reach an early, fair, and

23  just resolution.  And I think you need those factors to

24  be able to do that.  Somebody who's willing to say we

25  can win this case, we can show you how it's going to be

1   won, but you can also trust us.  And that's the way that

2   good settlements are developed.

3        I'll just highlight two remarks that were made

4   earlier as well.  One is that we did have the first

5   filed case and that was in the Northern District of

6   Florida.  We also were the first to name Colgate as a

7   defendant, and that was in a case that we filed in the

8   Eastern District of New York.

9        We welcome working with other plaintiffs'

10  attorneys that are not necessarily on a slate.  And I

11  know there are many esteemed very good plaintiffs'

12  attorneys.  And to give you an example, when we

13  discovered after doing investigation that Colgate should

14  be a named defendant, I reached out to several of those

15  fellow plaintiffs' counsel and I said, you should look

16  at Colgate because Colgate could be liable in this case

17  as well.  And they named Colgate as a co-defendant as

18  well.  And I think it's that type of trust, that type of

19  cooperation that this case needs.

20       Unless Your Honors have any questions for me, I

21  appreciate you allowing me to give you my remarks.

22            CHIEF JUDGE ROBINSON:  All right.  Thank you.

23            MR. REESE:  Thank you.

24            CHIEF JUDGE ROBINSON:  Did you have anything,

25  Judge James?

1          JUDGE JAMES:  I might have this question for

2     others, so you might address it in your comments.  But

3     I'm interested in whether your group has done any

4     testing.

5          MR. REESE:  I believe we have, Your Honor.

6          JUDGE JAMES:  Okay.  And have those results

7     been shared with the other parties?

8          MR. REESE:  No.

9          JUDGE JAMES:  Do you intend to share them

10    prior to mediation?

11         MR. REESE:  Yes, Your Honor.

12         JUDGE JAMES:  Very good.  Thank you.

13         MR. REESE:  Thank you.

14         CHIEF JUDGE ROBINSON:  All right.  Let's hear

15    next from the Hall Group.

16         MS. PETERSON:  Good morning, Your Honors.

17    Rebecca Peterson on behalf of the Hall Group leadership

18    slate who are behind me today.

19         And I would like to point out-- I know our

20    leadership group does look a little younger than some of

21    the other leadership groups here, but the attorneys--

22         MR. WEXLER:  Thank you.

23         MS. PETERSON:  The attorneys on this group

24    represent not-- diversity, which is one of the issues

25    that you wanted addressed; and diversity in age, in

1   experience, in geographic location.  And everyone on the

2   leadership slate has significant experience in class

3   action litigation or MDLs and they have worked hard and

4   litigated both of those, sometimes more behind the

5   scenes.  And now they want to move up and have a

6   position of leadership on these same types of cases that

7   they have litigated throughout their career and have--

8   given the opportunity to actually be on the leadership

9   slate of that.

10          And I do want to-- before I forget because you

11   just asked about the testing; our group, the Hall Group,

12   has done independent testing.  We, in fact, sent those

13   results to defense counsel prior to even amending our

14   complaint to add those allegations.  So we had done

15   independent testing.  And I believe we're waiting on

16   results on additional ones, but we did share those with

17   defense counsel directly before filing the complaint.

18          It's now in our complaint.  And since then, it's

19   been MDL'ed so all of plaintiffs' counsel have access to

20   those results because they're in our complaint.

21          And so the Hall Group represents a slate that

22   would efficiently and streamline the litigation of this

23   matter.  We have Mr. Wexler, who has been lead on an MDL

24   regarding pet food previously.

25          My own experience in the last 18 months I will

1    tell you has been devoted specifically to pet food

2    cases, including the *Champion* cases that Mr. Schaffer

3    has referred to.  We actually filed the first ones.  And

4    they're now-- you may look and ask why do we have 13 of

5    them?  Because we lost on *Bristol-Myers* so we had to go

6    file in 13 different states, but they're all regarding

7    the same pet food manufacturer.

8         It's about mislabeling of pet food.  It's

9    regarding testing, showing specific things that are in

10   the dog food, whether it's heavy metals, BPA.  Some of

11   them regard pentobarbital.  They all allege

12   adulteration, which I believe of all the complaints

13   before this MDL, the Hall Group are the only ones that

14   actually allege adulteration, which is something that

15   comes under the specific state feed laws or pet food

16   laws.

17        And it's an area that allows negligence for state

18   claims under many of those feed laws, which is important

19   when we get to class certification because there is no

20   reliance that's required.  And so there is-- we bring

21   that benefit to this case and opening it up as to

22   liability as to also adulteration.  That's also an issue

23   that's not very different amongst the states.

24        We've heard earlier today that many states, and I

25   think all of them, view pets as property.  None of them

1    have what I would say modernized to follow the view of

2    how actual people look at pets now and that they're not

3    just property.  But, unfortunately, most state laws are.

4         Where the same is true with adulteration, it is

5    based off of an AAFCO regulation and an FDA-- and most

6    states actually have that same adulteration standard,

7    which is not only regarding the toxic levels or

8    deficient levels of Vitamin D, but it's also regarding

9    when the quality and compensation of the food does not

10   match what's on the label.

11        Defense counsel earlier said today that a lot of

12   these cases have nothing to do with what's on the label.

13   Well, I believe they disclosed the amount of Vitamin D

14   on the label.  So this case isn't just about what's on

15   the web page, what's on the website, it is about what's

16   on the label of the cans, because they specifically say

17   that they have certain levels of Vitamin D in those

18   cans.

19        I also wanted to discuss as to the points that

20   you asked us to address in our presentation for lead.

21   The first one is whether there are different types of

22   plaintiffs and what those plaintiffs are.

23        The Hall Group has plaintiffs that bought the

24   recalled food and they have plaintiffs that bought the

25   deficient Vitamin D that are not part of the recall.  So

1    there are different plaintiffs.  However, how the class

2    is defined, they fall under the same.

3          And that's, I believe, the same if you look at

4    all the complaints in this MDL.  You'll have ones that

5    are dogs that have passed, you'll have ones that dogs

6    got sick, you'll have ones that simply bought the food

7    and have no dogs-- no injury to their pets.  But the

8    class is the same.

9          You heard about Mr. Mason speaking about the fact

10   that there's 249 individual class reps in his complaint.

11   And I do believe, though, if there's a consolidated

12   complaint, all of those class reps would fall under the

13   same class definition if it's nationwide.  249

14   individual plaintiffs is-- would be hard to have as

15   individual class reps here.  Class certification should

16   be limited narrowly to specific class reps.

17         And at this point, as Mr. Mason talked about,

18   there's no need to go outside of 48.  And, in fact,

19   recently the Ninth Circuit overturned *Kia,* which was the

20   reason why most included 48 class reps from each

21   individual state.  But that was recently addressed in

22   the Ninth Circuit and may not be an issue anymore.

23         But I do believe that even if we do have 249

24   consolidated complaint individual plaintiffs or if we

25   have three, the ultimate class definition will encompass

1   all plaintiffs, whether they have pets that were

2   injured, pets that were not injured, because it's a

3   consumer protection claim.  It's this pet parent went

4   out and bought Hill's, paid money for this product and

5   was misled in paying money for this product because of

6   the representation specifically about Vitamin D.  So

7   that would be the Hall's Group response to Issue

8   No. (1).

9        To Issue No. (2) with how we think a-- we would

10  see a PSC or a PEC run in this case.  Based on-- we

11  agree with what Mr. Mason alluded to, which is based on

12  the fact that there seems to be an agreement that early

13  mediation will occur here, that the PSC could have

14  members that are devoted specifically to just the

15  settlement and have a couple members specifically

16  dedicated to the discovery especially, because discovery

17  issues will be first and foremost if we're going to be

18  taking on the mediation by October or November.

19       So initially we would think that having a track

20  within the leadership, the one focusing on mediation,

21  the other one focusing on the litigation, which at the

22  beginning would be discovery issues going forward.

23       We do not believe at this time that - and this is

24  addressing a question you asked Mr. Mason I believe -

25  that there has to be subcommittees on the PSC.  Now, if

1    this case does not settle quickly and it does get into

2    formal discovery and lots of motion practice, I believe

3    at that time the parties can come back and visit with

4    the court and add additional people to the PSC or add

5    subcommittee members if required.  But at this time,

6    especially with the fact that all the parties are

7    agreeing that early mediation is on the table, just not

8    necessary at this time.

9         The third question-- the third point of if

10   we're-- if the Hall Group is willing to work with other

11   groups designated by the court and who are not part of

12   the group, and yes, of course.  We would respect any

13   discretion or decision by the court as to who they think

14   should be involved in leading this case and we look

15   forward to working with any talented attorney that's

16   sitting here behind me.

17        Many of us have worked with various people that

18   are here on different slates before so we know that we

19   do have good working relationships with the various

20   other firms on the slates here and we believe that that

21   same relationship would happen here.

22        No one on the Hall Group has funding and no one

23   would ever accept funding for this litigation going

24   forward.

25        And so those are all the main points that we saw

1   in your court's order from July 24th that you requested

2   that we address in our leadership presentation, but I

3   will address any questions you have.  Obviously our

4   papers go into detail as to the extensive experience as

5   to everyone on my slate.  I'm proud to be standing with

6   each of those attorneys in front of this court asking

7   for the opportunity to be involved in the leadership.

8         We have, as I spoke of earlier, we have diversity

9   in experience, age, gender, and geographic location.

10  And even-- I think one of the biggest points to make

11  about the Hall Group is that during this whole time as

12  the MDL was going on and people were waiting for today

13  and submitting lead papers, we did not stop our

14  investigation.  We did not stop our litigation of these

15  cases.

16        We continued to fight for FOIA documents, that we

17  didn't think we got a sufficient amount from our first

18  FOIA request.  We continued to do investigation as to

19  what information was out there publicly.  We had former

20  employees that were interviewed by people on the

21  executive committee.  We did additional testing on the

22  pet food.  And so I do think that that is one thing that

23  shows our commitment and our focus to this litigation

24  and although-- yes, we-- my team has a great past and

25  resume as to how they have litigated other cases,

1    whether it be class actions, MDLs.

2         But focusing on the present going forward, I

3    think we have shown in this case our commitment to be a

4    leader and our commitment to make sure to protect that

5    class and those plaintiffs and not close the door just

6    because of a specific statement by defense counsel or

7    defendant as to what this should be limited to.  And

8    we're here to litigate this on behalf of the class,

9    whatever that class is defined.

10        And if you have any other questions, I will be

11   willing to take them.

12        CHIEF JUDGE ROBINSON:  All right.  So did I

13   hear you say that you are-- you have done some

14   additional testing, you're still waiting on some test

15   results, although you did some earlier testing that

16   resulted in an amended complaint?

17        MS. PETERSON:  Yes, Your Honor.  We just

18   submitted new dog food testing this past week.  Vitamin

19   D is actually usually a two- to three-week test period.

20   It's not a quick turnaround.  So we would have that

21   additional testing in hopefully two weeks.

22        CHIEF JUDGE ROBINSON:  And is it testing for

23   both toxicity and deficiency?

24        MS. PETERSON:  Yeah.  So they test the levels

25   and they'll just give you a straight result as to levels

1    and then you can see if it's above or below.

2           CHIEF JUDGE ROBINSON:  Okay.  All right.  And

3    I'll ask you sort of the flip of a question I asked Ms.

4    Schwartz and Mr. Mason and company, because they

5    proposed someone to serve as both co-lead and liaison

6    counsel.  You and the other three groups have divided

7    those.

8           If you could just-- and you have spoken to how

9    you anticipate using the members of the PSC at least

10   during this early phase of the litigation, but define

11   the duties, if you will, of the co-leads as you see them

12   at least initially and the liaison counsel on your

13   slate.

14          MS. PETERSON:  Sure.  Your Honor, as to

15   co-leads, as I spoke to earlier, I believe that if it is

16   just myself and Mr. Macoretta, I would believe one of us

17   would focus specifically on the mediation and one of us

18   would focus on the discovery and the litigation going

19   forward at that time.

20          We have not had internal discussions as to who

21   would do what because there's been no official

22   appointment of us as lead, but I believe that we would

23   separate those tracks.  And the same would go down--

24   we'd have our members that are working with-- if I were

25   to take mediation, I'd have the PSC members that are

1   working with me at mediation and we'd have the ones that

2   are working on the discovery going forward.

3         Now, our liaison counsel, Mrs. Schwarz, she would

4   be a bridge between both.  She would not just fit on one

5   track or the other because of the duties of liaison

6   counsel is not something that you can just limit to

7   mediation or you can just limit to discovery.

8         I think our papers put forward the duties we

9   think she should have in this litigation, and it's not

10  just someone that's going to come sit in the courtroom

11  and be local counsel.  She has great experience herself

12  in MDLs, she has great experience in class actions, and

13  she brings a lot of benefit and value to our slate and

14  we would definitely be using that.

15        And that's why I think it's important that we

16  don't have someone that's liaison and lead, because the

17  liaison duties are extremely important and they often

18  even keep leads in check.  And so I think it's important

19  to have that balance as to where she is separate in that

20  sense, but obviously we're a-- you know, we're all

21  cohesive as a team.

22        CHIEF JUDGE ROBINSON:  All right.  Thank you.

23  Judge James, do you have anything?

24        JUDGE JAMES:  No, I don't.  Thanks.

25        CHIEF JUDGE ROBINSON:  All right.  Thank you.

1          MS. PETERSON:  Okay.  Thank you.

2          CHIEF JUDGE ROBINSON:  All right.  Anyone

3  else from that-- from the Hall Group?  No?  Okay.

4      All right.  Let's turn to the Schubert Group.

5          MR. SCHUBERT:  Thank you, Your Honor.  Our

6  firms are very proud of our experience, capacity to

7  handle complex litigation and excellent results in

8  complex litigation, particularly complex class actions.

9      We've submitted that in our resumes, I'm not

10  going to take the court's time going over that again,

11  and I will concede there are a lot of very talented and

12  experienced individuals in this room who would be very

13  competent handling this litigation.

14      I think the key question for the court or one key

15  question in determining who should serve as lead counsel

16  is what has happened so far.  The key to class actions

17  is very often the issue of class certification, and

18  class certification often turns on the class

19  representatives themselves.  An inadequate class

20  representative can often result in not getting

21  certified.

22      We focused our attention from the beginning on

23  adequately vetting the class representatives.  We were

24  contacted by over 300 representatives and they were

25  interviewed primarily by an attorney from our firm, a

1    few interviews were done by our paralegal.  They were

2    extensive interviews, often a half hour, even more.  And

3    we very carefully vetted those class reps.

4         Out of the 300, we were retained by approximately

5    60.  And those 60 individuals had veterinary records,

6    often had unused cans which could be tested.  Some of

7    them actually had records showing that their dogs had

8    tested positive for Vitamin D.  And we think those

9    efforts will go a long way towards getting a class

10   certified if we have to go to the class certification

11   stage.

12        We also resisted the defendant's attempt to put

13   our litigation on hold.  As I mentioned, we filed in the

14   Northern District of California.  And the first thing

15   the defendant asked is, let's put this case on hold,

16   it's going to go to an MDL.  In fact, we were the firm

17   that filed the MDL petition.

18        We agreed it would go to an MDL, we had asked for

19   it ourselves, but we did not want to put the case on

20   hold.  A primary reason was that of these hundreds of

21   class reps or potential class reps, quite a few of them

22   had dogs that were sick.  They had thirst, they had

23   vomiting, some of them had died but had not, as far as

24   we know, ingested the recalled food.  We were concerned

25   that non-recalled food may also have had excessive

1   Vitamin D.  I think it's a reasonable fear because there

2   was not one recall, there were three recalls.  And we

3   were concerned perhaps there should be a fourth.

4        So we resisted a motion to stay filed in the

5   court in San Francisco.  That motion to stay was denied

6   and that permitted us to get initial disclosures.  Had

7   the case been stayed, we would not have gotten initial

8   disclosures.

9        Defendants disclosed that they obviously had a

10  supplier, they did not manufacture the pre-mix itself.

11  But they refused or declined to disclose the name of the

12  supplier, so we wrote to them and asked them to correct

13  that deficiency.  Ultimately they did.  I believe we

14  were the first firm to get the name of the pre-mix

15  supplier, DSM.

16       We also hired an expert veterinarian with

17  expertise in food quality issues and various

18  constituents in the food.  Not only did we arrange for

19  testing, but we agreed on a testing protocol with the

20  defendant and, after a fair number of back-and-forth

21  battles, agreed on the company that would do the

22  testing.

23       We thought that was important because rather than

24  just test it ourselves and inevitably, depending on the

25  results, have a challenge to that test because it would

1   be our expert or our consulting firm, we had a

2   consulting firm agreed to by the defendants.  So those

3   results could hardly be challenged.  In fact, there was

4   some anomalies in those tests and there were re-tests.

5   We're re-testing more dog food.

6        We also filed FOIA requests which revealed

7   deficiencies in the procedures or lack of procedures in

8   testifying pre-mix and other constituent ingredients in

9   the food.  And as I mentioned earlier today, I think

10  it's terribly important that if we can settle this case,

11  and I sure hope we can, we have changes in Hill's

12  procedures, because the FDA has criticized them, we've

13  criticized them.  We think they can be much better so

14  this never happens again.

15       And while the emotional distress ultimately may

16  not be recoverable, we've had a lot of crying plaintiffs

17  on the line.  It's real.  Maybe not be recoverable, but

18  we don't want it ever to happen again.

19       So we think we've done a lot to advance the case,

20  and that is what sets us apart - at least equal but

21  apart - we think at a higher level than our co-counsel

22  in this case.

23       The testing-- or let me change that.  We continue

24  to move on the FOIA requests.  And just today we got a

25  response that was transmitted by one of the attorneys in

1   my office that the Vitamin D level in the pre-mix was

2   3,000 percent higher than what it was supposed to be.

3   And the cause of that apparently is the pre-mix supplier

4   did not add any Vitamin E, instead they added excess

5   Vitamin D3.

6        So in addition to have what apparently are toxic

7   levels of Vitamin D, it appears we have an inadequacy of

8   Vitamin E.  We haven't had a chance to analyze what the

9   effect of that would be, but it doesn't sound like a

10  good combination.

11       Let me address some of the specific questions

12  that the court has raised on Page 2, whether there are

13  different types of plaintiffs and what types of

14  plaintiffs they may be.

15       This has not been addressed by the other counsel,

16  but I think the plaintiffs fall in two distinct groups.

17  There are those whose dogs ingested bad food, food that

18  had excess Vitamin D and suffered illness or death.

19  That's a distinct group.  And then there are folks who

20  bought recalled food but whose dogs either didn't eat it

21  or did not suffer any ill-effects.

22       The latter folks are clearly out the cost of the

23  food.  That food was worthless.  And there are issues in

24  re-uniting those purchasers with the purchase price of

25  the food.  And I know Hill's has agreed to compensate

1  them, but I'm not sure how many people know of that

2  willingness to compensate, how you would get in touch.

3  There are issues of disclosure and notice and-- and

4  issues.

5      But I think the legal issue is fairly

6  straightforward.  Did they buy-- I mean, there's a

7  concession in effect that that food was worthless.  If

8  not explicitly, I think we'll be able to show that food

9  was worthless.  And there's a class of people in that.

10      Then there's the group, as I mentioned, of

11  plaintiffs who purchased the food of-- purchased the

12  food, fed it to their dogs, and the dog suffered

13  injuries.  And Hill's has been quite candid that they

14  will-- if this case goes into full litigation, they will

15  fight hard on issues of causation.  You know, was the

16  dog so sick or old that it would've suffered these

17  effects anyway?  Did the food really cause it?

18      And equally important or more important, they

19  made it very clear that if we go to litigation on class

20  certification, they will take the position that this is

21  like a personal injury case that cannot be certified.

22  I'm not conceding that for a second, but that is a very

23  difficult issue.

24      And what we may end up going to is an issue class

25  where we believe we could establish liability but the

1    actual damages payable to each of the class members
2    might be the subject of further litigation, perhaps even
3    transferee cases back to the court from which they
4    originated.  Not a good thing, and we hope we can
5    settle.
6          So we think there really are two distinct groups
7    and it would make sense-- with distinct issues.  It
8    might well make sense for the court to distinguish
9    between those two groups and make sure that different
10   attorneys-- I don't know if there's a conflict, but make
11   sure that different groups of attorneys or at least
12   different attorneys handle those issues separately.
13         And if that is the case, you know, we've done a
14   huge amount of work isolating plaintiffs who suffered,
15   whose dog suffered, either got ill or died.  And we
16   would like to work primarily on that portion of the
17   case.
18         The second issue the court raised:  How do you
19   envision an executive or steering committee to function?
20   As the court is aware, we did not suggest, unlike any of
21   the other groups, we did not suggest a steering or
22   executive committee.  And the reason for that is in our
23   experience, depending on the size of the case, it's oft
24   unnecessary.  And we decided not to cobble together or
25   arrange for co-counsel beyond our two firms.

 1           In our experience-- and sometimes it's necessary.
 2   You've got a big case like was referred to, the
 3   *Volkswagon Diesel Emissions* case, you absolutely need a
 4   significant executive committee.  We think this case,
 5   particularly at the stage it's at, can easily be handled
 6   by our two firms and that to have an executive committee
 7   as large as five or seven inevitably tends to cause more
 8   work to be done, which ultimately may well be
 9   inefficient.  You can manage those inefficiencies, but
10   we don't think it's necessary and we think it
11   potentially can cause excessive time, despite the best
12   intentions of counsel, can cause excessive time to be
13   run up, particularly in this kind of case if it's going
14   to settle through a mediation process.

15           We certainly would like to work with some of the
16   talent in this room, but the way that would work in our
17   opinion is based on our fee protocol, which the court
18   has, and it is extensive.  Specific jobs would be
19   delegated so there would be no risk of duplication.  So
20   that's our feeling on executive committee.

21           Now, if the court decides to have an executive
22   committee based on the talent in this room, we certainly
23   can work well with any of the members.  There are a lot
24   of good lawyers in this room, many of them we know and
25   have worked with before and would be happy to work with

 1   in the future.

 2        My contacts and my other attorneys in my office,

 3   their contacts with other plaintiffs' counsel have been

 4   very amicable before.  And despite a little bit of

 5   skirmish with defense counsel when they wanted to stay

 6   our case, we're confident we can work well with them.

 7   And, in fact, we agreed on a protocol and a testing

 8   regime, which none of the other counsel chose to go in

 9   that fashion.

10        We have no funders.  And, in fact, my firm has

11   never used a litigation funder.  It's a hot area but one

12   that we don't intend to get into.  And if the court has

13   questions, I'd be happy to answer them.

14             JUDGE JAMES:  Do you intend to share the

15   results of all the testing you have done with all the

16   other parties before mediation?

17             MR. SCHUBERT:  Yes.

18             JUDGE JAMES:  Has that already happened?

19             MR. SCHUBERT:  No, but it's been shared with

20   Hill's.

21             JUDGE JAMES:  All right.

22             MR. SCHUBERT:  And I can say this in

23   disclosure; to date, while we've found some anomalies or

24   the testers have reported some anomalies, we have not

25   found extra high levels of Vitamin D sufficient to be

1    toxic.  So for now our concern about non-recalled cans

2    being toxic has not been proven, but there are more cans

3    going out.

4         So I don't think those initial tests are-- it's

5    good news.  They're not all that meaningful, meaning

6    we're not at risk of non-recall cans - at least the ones

7    we sent - causing illness or death to dogs.  But, of

8    course, we'll share.  We'll share with everybody whether

9    we're lead or not.

10              CHIEF JUDGE ROBINSON:  All right.

11              JUDGE JAMES:  Thank you.

12              MR. SCHUBERT:  Mr. Coykendall.

13              MR. COYKENDALL:  Thank you, Your Honors.  I

14   don't have much to add to what Mr. Schubert said.  But

15   you do know our firm.  We have been in practice in

16   Kansas since 1945 and have served the people of Kansas

17   and the region since then, actively in both litigation

18   and other matters.

19         We are a full-service firm.  We have over 30

20   attorneys in the firm and can devote substantial

21   resources to the resolution of this case.  If you want

22   to talk about boots on the ground, we've had a Topeka

23   office for over 20 years and have litigators there that

24   are prepared and able to handle any matters that require

25   boots on the ground at Hill's corporate office, which is

 1   approximately a mile away from them.

 2        I'm sure you know the reputation of both the firm

 3   and the attorneys that serve that firm from prior times

 4   that they have appeared before you, so I don't need to

 5   say much about that.

 6        I have been involved in class action litigation

 7   since I started with the firm over 30 years ago.  I have

 8   been on both the plaintiff's side of the case and on the

 9   defense side of the case, representing many oil

10   companies defending against class action cases.  And I

11   believe that this brings a unique perspective to the

12   role of plaintiff counsel that is not shared by many of

13   the other counsel here.

14        I have been also a lead plaintiff in the-- I have

15   served in the leadership role in MDL litigation, serving

16   as the liaison counsel in the *Polyurethane* case tried by

17   Judge Lungstrum and the case below.  So I am familiar

18   with the role of lead counsel in complex cases and

19   liaison counsel in complex cases.

20        As to liaison counsel, we are proposing that

21   Diane Sorenson of my office serve as liaison counsel.

22   In this way, we believe that we achieve the benefits of

23   both having a liaison counsel who is within the firm of

24   a lead counsel or a co-lead counsel and also separate so

25   that she can devote her efforts to the communication

1    function and the coordination function necessary for

2    liaison counsel.  But we view her role as a leadership

3    role in the litigation as well.

4         So in that regard, we are proposing a structure

5    which is one-third led by women.  Our firm prides itself

6    on trying to maintain diversity in its structure and we

7    currently are 30 percent owned and operated by women.

8         Other than that, I want to say that we do not use

9    outside litigation funding, so that is not an issue.

10        If there are any questions I can answer, I'd be

11   happy to.

12             CHIEF JUDGE ROBINSON:  Are there other

13   counsel that are supporting your application?

14             MR. COYKENDALL:  No.  There are no counsel

15   from other cases that have supported our application.

16   We are seeking a leadership position and not trying to

17   formulate a coalition to present to the court for

18   someone to do the work.

19        We anticipate to be leaders of this herd of cats

20   and expect them to be responsible for certain aspects of

21   the case as it moves forward, such as coordination with

22   plaintiffs who may need to complete discovery, defending

23   depositions of plaintiffs.  That type of work we expect

24   fully that other counsel will be involved in.

25             CHIEF JUDGE ROBINSON:  Are you willing to

1    accept members from other groups as part of the

2    leadership group?

3            MR. COYKENDALL:  Absolutely.  Absolutely.  I

4    think both of our firms have shown abilities and

5    willingness to work with various groups of different

6    types of attorneys, and we pride ourselves in working

7    cooperatively with defendants as well.  So there should

8    be no question about our ability to work with anyone the

9    court desires.

10           CHIEF JUDGE ROBINSON:  All right.  And have

11   you all done any testing to date?

12           MR. COYKENDALL:  No, we have not done any

13   testing to date.

14           CHIEF JUDGE ROBINSON:  All right.  Did you

15   have any questions?

16           JUDGE JAMES:  No, I'm quite familiar with the

17   reputation of the firm and have friends there and high

18   regard.  And Kansas Baptist Convention comes to mind

19   with you, Mr. Coykendall.  Thank you.

20           MR. COYKENDALL:  Yes.

21           CHIEF JUDGE ROBINSON:  All right.  And last

22   but not least, Mr. Kamber from the Blaser Group.  Are

23   you speaking on behalf of--

24           MR. KAMBER:  Mr. Johnson was going to lead

25   off and then I was going to follow, if that's all right.

1          CHIEF JUDGE ROBINSON:  All right.  That will
2    be fine.
3          Mr. Coykendall, you might want to take your name
4    plate or I might confuse you with Mr. Johnson.
5          MR. JOHNSON:  Let me be the first to say good
6    afternoon because it is now afternoon.
7          I think as the court is aware, my name is Lynn
8    Johnson and I'm with the law firm Shamberg, Johnson &
9    Bergman.  And I am not seeking a leadership position,
10   but I am speaking on behalf of myself and my firm as
11   well as Larry Gates and his firm, Gates Shields, and
12   Brant McCoy, both of whom are either co-counsel or are
13   lead counsel for cases that are supporting the group
14   that has been called the Blaser Group.
15         I'm here to very briefly support that group.  And
16   I would start by indicating that based on my years of
17   experience and hopefully reputation within the District
18   of Kansas, I do not accept being co-counsel on cases
19   unless I believe in the case and unless I am fully aware
20   of and have great respect for my co-counsel.
21         So when I was approached to be co-counsel in the
22   *Blaser* case, I was informed by people and attorneys that
23   I respect that Deborah Kravitz and Scott Kamber, who I'm
24   co-counsel with in the *Blaser* case, are excellent,
25   experienced and probably, more importantly, are lawyers

1   who my other attorneys that I respect respect.  So I was

2   happy to become co-counsel in the *Blaser* case with the

3   KamberLaw firm, specifically Deborah Kravitz and Scott

4   Kamber.  I would not have done so otherwise.

5         Now, I'm here to simply advise the court that on

6   my-- myself and my firm and Mr. Gates and Mr. McCoy,

7   again we're not seeking any position, but we highly

8   recommend to this court that the Blaser Group be the

9   group that's appointed to be lead counsel and executive

10   committee and liaison counsel.

11         I was impressed by the fact that the KamberLaw

12   firm, specifically Deborah and Scott, were involved in

13   the *Blue Buffalo* MDL as lead counsel and also *In re:*

14   *Pet Food Liability Litigation*.

15         The executive committee would consist of two

16   additional law firms.  That's Joe Marchese of Bursor &

17   Fisher, and Joseph Kravec of Feinstein, Doyle, Payne &

18   Kravec.

19         I did a little research on all of those firms and

20   can assure this court that from my standpoint as being

21   co-counsel in one of the cases and the nine other cases

22   that support this group, that I would highly recommend

23   that the court give serious consideration to the Blaser

24   Group to be lead counsel and the executive committee and

25   liaison counsel from Wagstaff & Cartmell, who again I

1   know very well.  Sarah Ruane is considered to be amongst

2   her peers one of the best, and that firm has experience

3   in this court as both lead counsel and liaison counsel

4   in MDL cases.  Thank you.

5         CHIEF JUDGE ROBINSON:  Thank you.

6         Mr. Kamber.

7         MR. KAMBER:  Good afternoon, Your Honors.

8   Let me start out, before I circle back to some of the

9   points I've prepared to come here today, that I've

10   learned a lot about this case actually since sitting

11   here today.

12         Listening to the court, there are two particular

13   things that the court mentioned, both in the beginning

14   and then again when we began the leadership

15   presentations, was that you're looking for someone to be

16   a fiduciary as lead counsel needs to be, a fiduciary for

17   the class.

18         You're also looking for leadership to follow

19   Rule 1.  And the efficiency and the timing and running

20   through this, one of the first points you made was you

21   wanted-- you did not want this to be an MDL that you had

22   to come back to over a decade later.

23         Here, when you listen to defense counsel-- and

24   the first thing, what did defense counsel tell us?  They

25   told us something very important today in open court.

1    They made a point that they want to provide refunds for

2    the recalled dog food.   Okay?

3           That seems to be a point that hasn't been

4    mentioned yet in leadership, but it certainly needs to

5    impact and inform the court's decision regarding what

6    type of leadership would be appropriate in this case.

7           Here, we believe ultimately being a fiduciary for

8    the class means to be pursuing the cases that are the--

9    follow the claims that are in the vast majority of

10   cases, which is claims relating to the recalled dog

11   food.   That is the extent of the release the defendants

12   seek.   They are looking to mediate.   And they said very

13   clearly, defense counsel stated they had no interest in

14   mediating non-recalled dog food or non-recalled pet

15   food, because there's some allegations regarding other

16   pet foods.

17          This provides an important point of demarcation

18   between some of the plaintiffs' proposals that were made

19   to this court today.   And I think this now ties back to

20   one of the last things that Mr. Coykendall said and the

21   presentation that Mr. Johnson just made.   And that is:

22   Where is the support of the 32 firms that filed cases in

23   this MDL?   Where does their support lie?   It certainly

24   isn't dispositive, but on the Manual For Complex

25   Litigation and other court rulings, it's certainly

1    something that is taken into account.

2         In putting together the Blaser Group, we simply

3    didn't put out positions to everyone who wanted to

4    support us.  We wouldn't be interested in pursuing or

5    building a slate like that, it wouldn't be appropriate

6    in this case.

7         In our case, besides Mr. Johnson and besides

8    the-- there are ten other firms that support our case

9    without any promise or agreement as to compensation or

10   for position.  It's very easy to get somebody's support

11   if you offer them something for it that is

12   financial-related or leadership-related.

13        In my experience, it is somewhat more difficult

14   to persuade people to follow you.  Rarely does anybody

15   think any other lawyer is better than they are.  So you

16   need to persuade people to follow you because it's in

17   the best interest of the class, because this is the best

18   way to be fiduciaries of the class and the most

19   efficient way to pursue the litigation.

20        The Schubert firm-- the Schubert Group is the

21   smallest group of leadership presented to this court

22   today.  There are two people and two firms in the group.

23   There are two firms in leadership.  The Blaser Group is

24   the second smallest group with respect to the number of

25   people in leadership, the number of firms in leadership

1    that have been presented.

2         In our situation, the Blaser Group consists of:

3    Three members of the executive committee, one of whom my

4    firm-- the attorneys from my firm serving as chair and

5    interim class counsel, and also liaison counsel, the

6    Wagstaff firm, Ms. Ruane from the Wagstaff firm.

7         Yet with only those people, we still have the

8    support of nine other cases.  They're not promised

9    anything, they're not expecting anything.  They're there

10   in support-- they all have clients in their cases,

11   they've all done the due diligence and efforts that

12   would be necessary and expected of a plaintiff taking

13   the responsibility on to filing a lawsuit.

14        When you look at the other plaintiffs' groups, I

15   think it is telling that the vast majority of cases

16   support the groups that only want to pursue recalled dog

17   food.  That is what this MDL is about.  It's titled "dog

18   food."  It's not titled "pet food."  And we believe that

19   the appropriate thing-- I believe there are two cases

20   out of the 32 filed that have claims that go beyond

21   recalled dog food.

22        We're not saying that those claims shouldn't

23   exist, we're not saying those claims shouldn't be

24   litigated.  We're just saying that those should be

25   remanded and dealt with because we believe the

1  leadership group in this case should represent the vast

2  majority of firms and not pursue claims that are

3  unrelated to the recalled dog food.

4       Since there's only one or two cases that deal

5  with the non-recalled dog products, they don't need to

6  be as part of the MDL.  They can be pursued elsewhere.

7  Defendants have made very clear they are not seeking a

8  release from all pet food sales that Hill's makes.

9  They're seeking to refund in some way, shape, or form

10  the monies related to the purchase of the recalled dog

11  food.  It is wet dog food, it is canned dog food.

12       The FDA issued recall orders, voluntary recall

13  orders for a variety of different dry dog foods, and

14  none of the Hill's foods were part of those recalls.

15       I think it's important that we don't allow our

16  past experience-- and we've all been involved in many

17  litigations, many pet food litigations, many natural

18  food litigations that we have had to fight from day one

19  through testing, through complex litigation, through

20  filing in 14 different states, through every imaginable

21  machination that we do in litigation.  This is not that

22  case.

23       This case-- defendant's words themselves have

24  provided a path that we in our leadership applications

25  and this court in considering our leadership

1    applications should look at.  And that is recalled dog

2    food.  Defendants want to give back the money of the

3    consumers who purchased it.

4        As fiduciaries-- whoever stands in front of you

5    eventually and is appointed as lead counsel in this case

6    will have the fiduciary responsibility to the class.

7    And we believe-- the Blaser Group believes that the

8    fiduciary responsibility is to take defendants up on

9    their offer.  Take them to mediation, try to get them on

10   good terms, and the best terms for the class, to provide

11   a refund for all of the recalled dog food.

12       Obviously there's more to it than that.  There's

13   a reason you mediate, like what does a proof-- what does

14   a claims process look like, what does a proof look like?

15       More importantly, there's another important

16   process here.  The *Blue Buffalo* case where my firm was

17   lead dealt solely with label misrepresentations.  It was

18   about a refund case, and we had an excellent result in

19   that case.  And prior to this class being certified, I

20   think it was within two years of litigation commencing,

21   it was a $32 million common fund.  Over 100,000 claims

22   had been submitted to the court-- had been submitted for

23   payment with an average claim of over $100.  Some claims

24   being as high as several thousand dollars.

25       In *Menu Foods,* though, where my firm was lead

```
 1   counsel in the Menu Foods case-- and that had some real

 2   important lessons here, because in Menu Foods there was

 3   not only misrepresented dog food, pet food in that case,

 4   there was also injured and damaged dogs.  There was

 5   harm.  We had to develop an entire claims process.

 6          And, in fact, the mediation in that case, because

 7   there was complexities with the number of defendants,

 8   the number of manufacturers, the number of insurance

 9   claims, a bankrupt defendant, many complexities that

10   don't exist here, but in that case it required ten

11   mediation sessions which was an adventure in and of

12   itself, one that I don't relish doing here.  But it's

13   important to note that it is possible that this case

14   will result in more than one mediation session.

15          And that takes us back to Rule 1, and that was

16   the points that we made and all of the lead counsel

17   applicants had made in their presentation earlier, and

18   that is:  How do we pursue motions to dismiss,

19   consolidated complaint?  What is the schedule?

20          Again, the Blaser Group, I believe we're the only

21   group that made the point that we believe that a motion

22   to dismiss should not be stayed pending the mediation.

23          But when one looks at the dates, and I realize

24   this could've been-- that I wanted to make sure that we

25   were clear on this, and that is:  If August 19th is the
```

1   date, is a trigger date, and there's an appointment of

2   lead and there's a further order of the court, that

3   would mean the consolidated complaint would be filed on

4   or around September 19th.

5        Chances are, in that circumstance, a motion to

6   dismiss usually-- it isn't within 30 days, oftentimes

7   defendant asks for an extension.  We would expect a

8   motion to dismiss would probably-- or an answer to the

9   complaint - which is certainly possible in this case,

10  especially in a circumstance where the complaint only

11  deals with recalled dog food - it wouldn't be due likely

12  until after the mediation.

13       Whether it's successful, whether the mediation is

14  not successful, we have to realize that under Rule 1 we

15  can and are totally capable of pursuing a mediation at

16  the same time as dealing with and addressing a motion to

17  dismiss and other issues that may come up.  Certainly

18  O'Melveny is.

19       And I think it's important that Rule 1-- we can't

20  start assuming the case will resolve.  We hope the case

21  will resolve, but there's a lot of complexities besides

22  just defendants standing up in court and saying that

23  they want to provide a refund to the purchasers of

24  recalled dog food.

25       So I think, yeah, I wanted to just at first to

1   link the court's desire in understanding that it's a

2   fiduciary in Rule 1 with what I've heard in the

3   courtroom today and the perspectives from defendant and

4   how that impacts where we are.

5        I want to for a second to-- and I think that also

6   deals with the first point that the court had made in

7   the agenda for today and what the court wished to hear

8   from applicants for leadership.  And that is the type of

9   plaintiffs.

10       And the type of plaintiffs-- we believe it is a

11  uniform class of purchasers of recalled dog food.  Some

12  of those people did not have injuries to their pet and,

13  therefore, they would likely only be eligible for a

14  refund of the dog food.

15       There were other people whose pets were harmed.

16  They have vet bills, they have real compensable

17  injuries.  That is a different type of damage, but it is

18  ultimately the same group of plaintiffs.

19       This is not a case-- unless this court wishes

20  this case to go on for an unnecessarily long period of

21  time, it is not a case that would require the several

22  hundred plaintiffs that were discussed, 250 plaintiffs

23  in a consolidated complaint.  If the case does not

24  resolve to our group, that triggers the simple fact of

25  250 class depositions.

1        I've never seen a case where defendants haven't

2   wanted to depose every potential class representative.

3   Okay?  I believe as fiduciary over the class, not

4   wanting to spend more money than we need to to get a

5   result, we should not have more representative

6   plaintiffs on a complaint than is necessary in order to

7   be adequately representing the class that will

8   ultimately be moved to be certified.

9        Every case is a slightly different experience.

10  Most of the lawyers here have been lead counsel in MDLs

11  before, some of whom have been lead counsels in other

12  pet food MDLs before.  But I think it's important and

13  the point we're trying to make sure, Your Honor, is that

14  every case is different and what we hear in this court

15  informs what we put in our papers.  It informs I believe

16  also how the court should make the decision here.

17       We built a team here and the leadership-- this

18  goes to the court's second point of the leadership

19  function.  How does our group work?  Why does our group

20  work?  Well, the one thing I am proud of is that the

21  group came together - and not just the lawyers here who

22  are in leadership but all of the law firms who support

23  us - and there was a-- it was not that difficult to

24  persuade people that our firm should serve as lead here,

25  okay, and that specifically Deborah Kravitz and myself

1   serving as lead based upon the results that we had in

2   *Blue Buffalo*.

3        One of the lawyers, Mr. Marchese from Bursor &

4   Fisher, he served on the executive committee in *Blue*

5   *Buffalo*.  Don Downing, who is not involved in this case,

6   also served on the executive committee in *Blue Buffalo.*

7   Both of them supported us in leadership in *Blue Buffalo*.

8   That was a case that did not look like it would have

9   early resolution.  We saw an opportunity for an early

10  resolution.  We focused on that opportunity for

11  resolution.  We succeeded in that opportunity for early

12  resolution, and we didn't sacrifice one penny of result

13  in order to obtain that early resolution.

14       And I'm-- you know, in this situation, the Bursor

15  & Fisher firm, having worked with us before in that

16  case, have chosen to support us again as lead counsel.

17  Not that Mr. Marchese didn't want to be lead counsel

18  himself, I'm sure he would've loved to be co-lead

19  counsel, as would all of the people in our leadership.

20  But ultimately we believed, given the size of this case,

21  we wanted to give this court a choice of a slate with

22  lead counsel from a single firm.

23       Also on the executive committee is Bursor &

24  Fisher, having worked with them before.  They have

25  certified seven I believe it was-- he has-- Joe Marchese

 1   himself, not just the firm, has been involved in seven

 2   class certifications, contested class certifications in

 3   the last two years.

 4       Mr. Marchese is a talented lawyer and his firm is

 5   a firm that I like to have with me when I go into court

 6   for mediation because where my firm has trial

 7   capabilities, Bursor & Fisher has tried I believe more

 8   consumer cases to trial in the last five years than

 9   almost anyone else.

10       Does that mean that this case is going to go to

11   trial?  No, it doesn't, Your Honor.  But to have that

12   ability in a mediation to say we could take this case to

13   trial, look at the track record of our counsel, is this

14   what you want to be involved with?  If you want-- do you

15   want to not settle the case now?  That was helpful in

16   *Blue Buffalo*.

17       Mr. Kravec from the Feinstein Doyle firm has

18   been-- himself has been involved and certified numerous

19   class actions.  He's been involved for over two decades

20   in large litigations, including securities litigations.

21   A great diversity of experience with respect to

22   settlement, et cetera.  And not only settlement in

23   litigation but there was broad support for him amongst

24   other people in our group who have worked with Mr.

25   Kravec before.

1          Further, Ms. Ruane from the Wagstaff firm, she is

2     somebody who has been particularly helpful, although not

3     local counsel for my firm when we filed or co-counsel.

4     Ms. Ruane has been particularly talented in everything

5     that we have worked with and been involved with her

6     doing.  She was eager to serve as liaison counsel here.

7     Her firm is certainly talented and serving in the

8     capacity and having the resources to adequately

9     represent the class.

10         And just to reflect for one second on an issue

11    from the MSR Group.  Their point was that under Local

12    Rule 5.4.2, they read the local rule that they believed

13    that liaison counsel should be in leadership.  Our

14    perspective was on efficiency.  And in other cases we've

15    always bifurcated the role of leadership-- not always

16    but on many occasions have bifurcated the role of

17    liaison counsel and a lead counsel.

18         If the court were to choose to appoint our group,

19    we certainly would entertain and welcome Ms. Ruane in

20    the leadership structure.  She could wear both of those

21    hats.  If that was something the court thought would be

22    more efficient or better serving the local rules,

23    certainly that would be something that we would welcome,

24    Ms. Ruane's talents to the leadership.

25         With respect to including other groups, the third

1    point from the-- from Your Honors' agenda, was in our

2    group we created this leadership structure not out of

3    whole cloth but because in past cases, including *Blue*

4    *Buffalo*, we had found that there was an executive

5    committee with a chair of the executive committee is a

6    great way to litigate a case, make sure everybody is

7    included throughout the entire process.  There is a

8    place that the buck stops.

9        So when the court hopefully doesn't get angry at

10   us, but if the court has something that they need a

11   response or an answer to, they have one person, one firm

12   where the buck stops with them, but allows the diversity

13   of viewpoints and perspectives that a leadership

14   committee and executive committee provides.  We believe

15   that three was the optimal number in the case because we

16   think each of the people in the case, plus liaison

17   counsel, provides a very good balance of perspectives.

18       We used a leadership structure of five, as we did

19   in *Blue Buffalo.*  So when we contemplated this, we

20   thought about, hey, you know, certainly Mr. Johnson

21   would certainly serve well as lead counsel in this case.

22   Certainly other lawyers from our group who support us

23   would serve well.  But we specifically didn't want to

24   expand beyond three lawyers because we wanted to make

25   sure we kept a seat or two empty.  Not that we can't

1   litigate and aren't happy to litigate this case with

2   three, but knowing the interest that the court had with

3   respect to involvement of a broad group of people, we

4   felt that having three - and not appointing everybody

5   from our particular group - we'd be able to take our

6   leadership group and expand it if there was other people

7   in this case that the court thought would be appropriate

8   to expand it to.

9       I can say that-- I mean, frankly, we've worked--

10  there are certain lawyers that we've worked with.  In

11  particular, Ms. Schwartz from the Stueve firm, we had

12  never worked with her before.  She was immensely

13  talented, immensely helpful in working with our team,

14  with lawyers in our team in putting together the joint

15  filings with defendants, putting together the other

16  materials for these hearings.

17      And if the court were to have interest in having

18  additional people on this, certainly Ms. Schwartz is

19  somebody that might-- that our group would be-- would

20  have the pleasure to serve with.  She's been immensely

21  talented and I've really enjoyed the opportunity to get

22  to work with her so far in this case, whether or not our

23  firm becomes lead.

24      And on that, Your Honor, even ultimately if this

25  court chooses not to appoint my firm as lead or anyone

1    in our group as lead, I would implore the court to

2    appoint people who understand the fiduciary obligation

3    and look at this case from a narrow perspective, not a

4    giant MDL perspective of massive committees, but to

5    ultimately appoint a group of people - even if it

6    doesn't include us - that is narrowly tailored with a

7    single or at worst two co-lead counsel, with three to

8    five lawyers involved in leadership because ultimately I

9    think that will best serve the class.  And at the end of

10   the day, the fee will just eat less of what the dollars

11   should be that were available to go to the class.

12         And I think that's very, very important to each

13   of the people in our group and to the people who

14   supported our group and have sacrificed their own

15   personal interest in leadership in order to support us,

16   because they believe that the way to best serve their

17   clients' interest in this case is to have a narrow

18   leadership.

19         Your fourth point, Your Honor, diversity.  Our

20   group contains immensely talented people of a variety of

21   ages.  In fact, each decade from the 30s through the 50s

22   are represented in our group.  We have geographical

23   diversity.  We have gender diversity.

24         Looking at this, for example-- we also have

25   experience-- diversity of experience of backgrounds.  We

1   have former federal prosecutors in our group.  We have

2   former defense attorneys in our group.  We have former

3   in-house counsel in our group.  We have former

4   compliance officers in our group.

5        Amongst just the four-- amongst just the four

6   firms and the five attorneys who are in our leadership

7   group, we represent an immense difference of

8   perspectives and we bring to the table a real diversity

9   of viewpoints.  And I think that's-- to me when we were

10  putting together this group, I think what's so important

11  about an executive committee, it doesn't take ten people

12  to necessarily create diversity of perspectives.

13       But I know, having worked with many of these

14  people in *Blue Buffalo*, I know that this group is one

15  that is large enough from perspectives-wise that we

16  won't have a blind spot but small enough to be

17  particularly efficient and to deliver as fiduciaries to

18  this court and ultimately to the class.

19       I'm just seeing if I need-- if I have anything

20  else to add.  Does the court have any questions?

21            JUDGE JAMES:  Has your firm caused any

22  testing to be done?

23            MR. KAMBER:  Our group has had testing.

24            JUDGE JAMES:  Yeah, I'm sorry, your group.

25            MR. KAMBER:  Yes, they have, Your Honor.  And

 1    we have not shared it to date.  But the testing that we

 2    have done informs the decisions that we've made as a

 3    group as far as which-- the fact that this should be a

 4    case limited to recalled dog food.  I think it's

 5    important that, simply put, our testing didn't support

 6    the idea that this-- that the FDA was wrong and that

 7    other products should be recalled.

 8              JUDGE JAMES:  So do I understand you that

 9    your group did test some non-recalled food?

10              MR. KAMBER:  That is correct, Your Honor.

11              JUDGE JAMES:  And did not find a Vitamin D

12    problem?

13              MR. KAMBER:  That is correct, Your Honor.

14    Now, that's not to say-- but obviously there's only a

15    certain number of SKUs, a certain number of products

16    that could be tested.  But when we started seeing-- one

17    of the firms with us in particular, when they started

18    seeing that in some of the complaints and some of the

19    undercurrent of the plaintiffs, we wanted to make sure

20    that there wasn't something else out there.

21         Frankly, if we found something, I'm not sure we

22    would've felt it would be appropriate to bring it in

23    this class action.  It may be something that maybe

24    would've been brought in another case at another day,

25    but that wasn't the case.

1        I also realize there was one point that I failed

2    to address and that was the last point, the Point (5) of

3    the court's agenda about funding.  Neither my firm, nor

4    anybody in our group, has or will use funding related to

5    this or needs to use funding relating to this

6    litigation.  And I can make the representation for my

7    own firm that we have never used funding for any of the

8    MDLs that we have served as leadership on as lead

9    counsel, or for any case for that matter.

10        JUDGE JAMES:  And going back to the testing

11    issue.  Prior to the mediation will you share whatever

12    testing results you have with all the parties?

13        MR. KAMBER:  If we were to be-- yes.  And if

14    we were to serve as lead counsel, Your Honor, one of the

15    things that we would do is to try to collect all of the

16    information that has been accumulated, the collective

17    wisdom of the plaintiffs' firms.  There's been some

18    inconsistency with respect to what has been shared, what

19    has not been shared, what would be appropriate to share.

20        And I think we need to have a cohesive

21    perspective so that it wouldn't be right to surprise the

22    defendants at the mediation, as they've referred to it

23    as plaintiff discovery.  We wouldn't expect to be

24    surprised by defendants at the mediation.  Either of

25    those two things would be poison.

1       And I think also, just reflecting on that, when
2   one looks at-- this is an unusual case in which the
3   defendants actually submitted a filing that in some ways
4   relates to the appointment of lead counsel.  I have to
5   say I think I've only seen that one or two other times.
6   And I'm certainly not going to be involved or get
7   involved in, you know, the veracity or the perspective I
8   bring to that.  I wasn't involved with what was going on
9   between the firms.

10      But I do think it becomes relevant when one looks
11  at if there is a poor relationship between firms -
12  between plaintiffs and defendants - before a case
13  begins, I think that that-- I think that it is a risk
14  unnecessary to take in appointing a fiduciary for the
15  class because, ultimately, early resolution of the
16  case-- there's not a lot of time between now and October
17  to build relationships.

18      And I think it's important not that defendant
19  have a particularly fond perspective of whoever is
20  appointed lead, that's not really our roles, to be
21  everybody's friend.  But it is important that there be
22  respect and it is important that there not be baggage in
23  that relationship.  There's just not enough time to
24  solve that problem between now and October.

25          CHIEF JUDGE ROBINSON:  All right.  Thank you.

1              JUDGE JAMES:  One other thing, not to sound

2      like a dog with a bone on this testing business, but do

3      I understand you that even if you were shown testing

4      results prior to the mediation that showed there might

5      be a problem with some non-recalled food, you would not

6      support an amended complaint in this case raising a

7      claim for non-recalled food?  Do I understand you

8      correctly?

9              MR. KAMBER:  Yes.  And the reason is, Your

10     Honor, this is a case defendants have taken-- hearing

11     them in the courtroom is not the first time.  People in

12     my group have had numerous cases with O'Melveny, have an

13     existing relationship with the attorneys at O'Melveny,

14     and have spoken to O'Melveny specifically about this

15     case and potential resolution, as I believe everybody in

16     this courtroom has.  This is not a secret that O'Melveny

17     has kept through this litigation.

18          I think what's important here is they have been

19     committed to the idea, consistent with the FDA findings,

20     that this is a case about recalled dog food.  And I

21     believe if there are cases against Hill's that are--

22     that Hill's doesn't identify as being a problem but that

23     may exist in the world of Hill's food outside of

24     recalled dog food, it should be something litigated

25     separately.  Because again, not for me to sound like a

1    dog with the bone here, but that defendants want to come

2    to some resolution with recalled dog food.

3         And as a fiduciary, it is our role as lead

4    counsel, or whoever is appointed lead counsel, to come

5    up with a really fair and efficient way of taking Hill's

6    money and getting it to the class members as quickly as

7    possible and to give a release that is narrowly tailored

8    to the relief that they're providing.

9         Hill's has been clear.  They want to provide a

10   release that's as broad as the relief that they are

11   looking to give.  It is a case involving recalled dog

12   food.  They want to give a-- they want a release for

13   recalled dog food and they want to pay money for

14   recalled dog food.  And I believe that the leadership

15   should reflect that.  Thank you, Your Honors.

16             CHIEF JUDGE ROBINSON:  All right.  Thank you.

17             MR. GOETZ:  May I have 60 seconds, Your

18   Honor?

19             CHIEF JUDGE ROBINSON:  Yes, Mr. Goetz.

20             MR. GOETZ:  I should clarify that we actually

21   didn't submit any opposition on a selection of counsel.

22   When we submitted our statement of the case, we pointed

23   out what we thought were some errors in the submissions

24   of some of the parties who made the submissions.  We

25   didn't want to be silent on those and made sure the

1   court was aware of those.  But our position on the

2   selection of counsel is that we understand it's your

3   choice, not ours, and we didn't mean to imply otherwise.

4       I just have three quick points I want to make,

5   and one of them is to pick up on Judge James' questions

6   about sharing.  That's very important to us and it feeds

7   into my second point.  But on sharing, we've shared, we

8   were the ones who pointed out who our supplier is.  It's

9   not a secret who our supplier is.  And when we learned

10   that one of the plaintiffs' group wasn't sharing that

11   disclosure that we made in the case with the other

12   plaintiffs, we sent it around to everyone so that they

13   would know the fact that DSM is our supplier.

14       We wish to share information.  We will share

15   information going into the mediation, but it's a two-way

16   street.  We've had a very difficult time not just

17   getting test results but getting medical records.  And

18   the medical records of these pets are important for us

19   to assess the claims.

20       And so we're going to be asking for information

21   about the pets for the named reps, that's what they

22   stood up for when they said they wished to be named

23   reps.  Although as we noted in our papers, there's some

24   confusion on whether one of the named reps knows she's

25   an actually named rep.  But in general, that's what they

1   agreed to do.  They would be named reps and that they

2   would share this information and we need their medical

3   records.

4        That leads into my second point, which is on

5   non-recalled products.  We've been very open to

6   mediating the claims in this case, but what we've just

7   heard is that there are tests that have been done that

8   have confirmed that the products other than those

9   recalled met Vitamin D levels.

10       So what we're resisting is the notion that

11  somebody who had a product that had the right levels of

12  Vitamin D and had everything else the label promised--

13  by the way, the label doesn't list levels of Vitamin D.

14  I know the Hall plaintiffs suggested it did.  Those

15  errors can happen.  We have the cans here, we can show

16  the court, but it really isn't the key issue here.

17       The key issue is:  If your product was exactly

18  what it was supposed to be, can you make an economic

19  loss claim against Hill's because some other customers'

20  product got recalled and that other customer was

21  refunded?  That may sound odd if you haven't encountered

22  those types of cases, but they do come along.  And we've

23  seen some suggestion by a very small minority of the

24  plaintiffs in this litigation they would like to have

25  those types of claims.

1        So it would not be limited to products that have

2   any problem with them, it would be all products Hill's

3   has sold with no limitation.  I don't see how you even

4   mediate that type of dispute, and I agree they really

5   shouldn't be here.  I don't think they should be here

6   because I think it's clear I think they're meritless.

7   But there you have it.

8        And finally on the motion to dismiss.  Mr. Kamber

9   is alone in suggesting, and his group, that those should

10  proceed forward.  But he has also suggested, and I agree

11  with him on this, that the dollars should go to the

12  class.  That's what he just said when he spoke to this

13  court.

14       And that's exactly why I believe and we believe--

15  Hill's believes that the motions to dismiss, which

16  you've heard today will be very costly, should be put

17  off.  And it's not just our costs, it's costs that we

18  would incur and we would rather not incur because we

19  would rather do what we've promised to do, which is to

20  make these customers whole, refund them the price that

21  they paid for their vet bills.

22       But the plaintiffs in this room who work on these

23  motions are going to ask this court to make us pay for

24  those as well, and we don't think that that makes any

25  sense when we have always been clear that we would like

1    to resolve these claims.

2          We have refunded to our customers the money they

3    have sought from us.  We're willing to talk about that

4    in a mediation.  It's mediation, we can talk about

5    anything the parties wish to raise and resolve, but it

6    doesn't make any sense to spend a lot of money on very

7    complicated motions or for this court to have to spend

8    the time to resolve them under all these various states'

9    laws when we have an aggressive schedule to try to

10   resolve the litigation.  Thank you, Your Honor.

11          CHIEF JUDGE ROBINSON:  Thank you.

12          MR. SCHUBERT:  May I have a minute?

13          CHIEF JUDGE ROBINSON:  Go ahead.

14          MR. SCHUBERT:  Your Honor, I want-- I'd like

15   to correct one statement made by the Hill's chief

16   counsel.  He represented that Hill's voluntarily

17   disclosed the name of its supplier, and that is

18   incorrect.  In the initial disclosures in the California

19   case, Hill's did not disclose it initially.  We objected

20   to the initial disclosure and then they filed a revised

21   initial disclosure which indicated that DSM was indeed

22   the supplier of the pre-mix.

23          I do want to share my agreement with him, though,

24   that this case need not go to motions to dismiss at this

25   time.  We should give it a fair shot at mediation.  We

1    should have an amended complaint which will define the

2    class involved, the states involved.  Motions to

3    dismiss, whether even based on a bellwether number or

4    the entire complaint, is an expense we can get involved

5    in later.

6         CHIEF JUDGE ROBINSON:  All right.  Thank you,

7    Mr. Schubert.

8         All right.  Well, I think we have covered all of

9    the matters that we anticipated we would cover today.  I

10   think it's been a very productive hearing for Judge

11   James and me.  And I appreciate all of your submissions

12   as well as your clear and honest answers to all of our

13   questions today.

14        I intend, as I said, to get an appointment order

15   out later this week.  So you all reminded me repeatedly

16   at the beginning of the hearing when I wanted to take up

17   scheduling and discovery matters first that, you know,

18   obviously a lot of this hinges on who the leadership

19   group will be.  So we will take that to heart, get an

20   order out.  Look forward to your joint status report on

21   August 12 and then see you all back on August 19th.

22        Hopefully the flow of information has been as

23   productive for you as well.  Hopefully Judge James and I

24   have given you some food for thought on what we want you

25   all to be focusing on in the interim.

1          Again, if there are any questions about anything

2     along those lines, ask now while we're all here

3     together, that would be most helpful.  All right.  I see

4     not.

5          All right.  Well, thank you again.  We appreciate

6     our first introduction to all of you and look forward to

7     seeing you all again soon.

8               (12:47 p.m., proceedings concluded).

9

10                         *  *  *

11

12

13               C E R T I F I C A T E

14       I certify that the foregoing is a correct

15     transcript from the record of proceedings in the

16     above-entitled matter.

17

18     August 1, 2019.

19

20

                         /s/ Kelli Stewart _____
21                       KELLI STEWART, CSR, RPR, CRR, RMR
                         United States Court Reporter
22

23

24

25